**Betty Elaine VASSAUR, Appellant,**

v.

**The STATE of Oklahoma, Appellee.**

**No. A–17921.**

Court of Criminal Appeals of Oklahoma.

Sept. 13, 1973.

Rehearing Denied Oct. 11, 1973.

Boatman & Laub, Okmulgee, for appellant.

Larry Derryberry, Atty. Gen., Fred H. Anderson, Asst. Atty. Gen., for appellee.

## OPINION

PER CURIAM:

Appellant, Betty Elaine Vassaur, hereinafter referred to as defendant, was charged, tried and convicted in the District Court of Okmulgee County, Case No. CRF-71-99, for the offense of Manslaughter in the First Degree. She was sentenced to serve a term of four (4) years in the State Pentientiary in accordance with the verdict of the jury and a timely appeal has been perfected to this Court.

Defendant had been married to Ed Vassaur for about eight years, there were no children born of that marriage, and on April 26, 1971, defendant commenced a divorce action against Ed Vassaur. The petition for divorce requested issuance of a restraining order against her husband, but none was issued by the court.

Early in the morning of August 9, 1971, defendant and her husband became engaged in an argument which resulted in defendant's shooting her husband with a .38 caliber pistol. There was no denial that

defendant shot her husband nor that the shot she fired caused his death. The shooting occurred sometime after 3:00 a. m. on the morning of August 9, 1971. The victim was taken to the Emergency Room of the Okmulgee General Hospital, but after he was examined, and provided certain emergency treatment, he was moved to the St. Francis Hospital in Tulsa, Oklahoma, where he died shortly thereafter.

Dr. Robert Fogel, who performed the autopsy on the body, testified that the gun shot was the cause of death and that no powder burns were observed on the body. However, when he performed the autopsy, the body was nude. He also offered explanations for the absence of powder burns, one of which would have been the clothing which the deceased was wearing, which would have absorbed the gun powder; and another explanation was, absent the clothing, that the weapon was far enough from the deceased to prevent body powder burns.

Three Okmulgee Police Officers, Edgar Carter, Perry Rickman, and Jerry Sullivan, answered the radio dispatch about 3:30 a. m. Dr. Ernest Ross arrived at the scene a few moments after the police arrived and observed the ambulance arriving as he drove up to the Vassaur residence. Officer Carter arrived first and observed the wounded man lying in the gravel drive, between defendant's Oldsmobile and Ed Vassaur's panel truck. When the officer asked Ed what happened he replied that his wife shot him. When he asked the defendant what happened, she replied, "I shot my husband." When Officer Carter asked defendant for the weapon, she went into the house, obtained the pistol, and gave it to the officer. Officer Carter informed defendant she was under arrest and explained her constitutional rights to her. He also testified that he did not observe any wounds or bruises on her anywhere nor did she complain of any. On cross-examination, Officer Carter testified that the victim was wearing a dark suit with matching pants and a white shirt.

Officer Sullivan testified that the wounded man did not say anything to him, but he heard him answer Officer Carter's question, saying that his wife shot him. He testified that Dr. Ross picked up the victim's arm, looked at the victim and went into the house. On cross-examination, he testified that defendant showed him a bruise on her arm, but he didn't observe any other bruises on her.

Officer Rickman entered the house soon after he arrived. He related that the defendant was hysterical, but when he asked her what had happened, she answered saying "that she had a right to an attorney," and I said, "Yes ma'am, you do," and then I never asked her no more questions." He said she was flighty, moved back and forth from room to room, and did a lot of talking. He observed her "stubbed toe," but did not observe any other injuries. On cross-examination, Officer Rickman testified that he observed Dr. Ross lift up the victim's shirt to check the wound, and said that the victim was wearing a plaid shirt.

Kenneth Dale Milligan was with the defendant on the evening of August 8th in the Cook's backyard across the street from the Vassaur residence where the four adults present were drinking wine. When he noticed Ed Vassaur sitting next door, he mentioned the fact to those present. He and the defendant and her two daughters left, going down the alley where they met Sandy Taylor and Sharon Cook and went driving in Sandy's automobile. They drove about town for about fifteen minutes and stopped and parked about thirty minutes, where they sat and talked and continued to drink the remainder of the two bottles of wine. They returned to the vicinity of the Vassaur residence where the witness, defendant, her two daughters and Sharon Cook got out of the car. Defendant's two daughters went with Sharon Cook to spend the night with her and defendant and Kenneth Milligan went to the Vassaur's vacant rent house, called the "White House," behind the residence. The witness and defendant went into the house

and stayed for about forty-five minutes in the bedroom. The witness testified he entered the house first to look around to be sure no one was there and a couple of minutes later, the defendant entered. This witness was asked, "And what did you do then?" He answered, "Just searched around the house a little more and then made love to her." Defendant objected and moved for a mistrial, for the reason at the pretrial conference the court instructed that the illicit affair would not be admissible in that it was assertedly testimony of another crime. Defendant's objection and motion for mistrial were denied, but the court allowed a short recess for the prosecutor to further advise with his witness.

After the recess, Kenneth Milligan continued his testimony. He related further that when he sat down on the bed he felt the pistol defendant possessed. Later, when he left the "White House," he left through the back door leading onto the carport, went through the fence and looked back and saw Ed Vassaur coming and hid behind the gate. He said when defendant came out the door, she said something to Ed, "and he [Ed Vassaur] just turned around and hit her." He continued that he heard defendant say something "real low" and he hid under a table next door and heard some moaning, then he left and ran some two blocks to his aunt's house where he encountered his brother, who was on the front porch. He said they talked three or four minutes when he told his brother what happened and they went into the back bedroom. Next he heard a shot and a scream. The witness was then asked, "Before you left the little white house, did you—just before you left, did you hear the defendant, Betty Vassaur, say anything?" He said, "Yes, sir, I heard—" The prosecutor interrupted and asked further, "What was that?" The witness answered, "She said that 'I've—I heard that you been looking for me.' And she said, 'But I'm going to kill you first.' "

Just a few minutes earlier this witness testified in answer to the question, "Did you hear anything said or done at that time?" The time was when the witness was hiding behind the gate in the yard next door, some twenty-five feet from the two persons. He replied, "She just said something real low and that's when he hit her and that's when I left."

On cross-examination, defense counsel challenged Kenneth Milligan's testimony with the testimony he gave at the preliminary examination. The witness admitted that he testified at the preliminary examination that defendant first said to Ed Vassaur "Hey, Ed" or "Hi, Ed" and that Ed spun around and hit her with his doubled-up fist, which knocked her down. The witness admitted that he had earlier given at least two other versions of what transpired and admitted to the court that his testimony at the preliminary examination was different to his testimony at trial.

Dr. Robert Fogel next testified concerning his autopsy of the body, and related that the blood sample taken from the deceased man's body revealed considerable alcohol content, but stated that could be contributed to numerous other factors. However, premised upon defense counsel's hypothetical analysis, the doctor admitted that a deduction could be reached that at the time of the incident, the deceased man may have had .24 of one percent of blood alcohol in his system, which would have caused him to have been very intoxicated.

Dale Holland was the ambulance driver who picked up the wounded man and carried him to the Okmulgee Hospital. Answering a question concerning what the wounded man might have said in the ambulance, he said "He—well, we put him in the car and he said that she had shot him, that he had provoked her before but she shot him this time." He also testified that Mrs. Vassaur called for the ambulance and said, "I've shot my husband and we need an ambulance." He related that she did not sound hysterical at that time.

Prior to the commencement of trial, the prosecutor asked leave of the court to endorse the name of Esten Wayne Milligan

as a witness. Defendant's objections to this endorsement were overruled. Esten Wayne Milligan, the brother to Kenneth Dale Milligan who testified earlier, appeared as the next witness. He was permitted to testify over defendant's further objections that the witness' sworn statement had not been furnished him until a few minutes prior to the commencement of trial. The court had earlier ordered that defendant be furnished a copy of all sworn statements taken by the State from the time the original Information was filed. The Assistant Attorney General informed the court that he furnished a copy of this statement as soon as he learned defense counsel had not received such statement. Defendant's objections were overruled.

Esten Wayne Milligan, known as "Rip," had been sleeping on the front porch of Mr. Herman Flock when he observed his brother coming up the road in a hurry. He was unable to say what time it was except to say it was after midnight. He related that the two talked on the front porch "for awhile" and then testified, "We heard this shot and heard some screaming, then we went in the house." He also said that they heard the shot and screaming about fifteen or twenty minutes after his brother arrived.

The prosecution announced that notwithstanding the fact that Nurse Jacqueline First had been subpoenaed by the State, they did not intend to use her testimony for the reason her testimony would only be cumulative. After some discussion, the court agreed to permit defense counsel to call the nurse out of time as a defense witness. The parties also stipulated to the ballistics expert's testimony that the bullet removed from the deceased was fired from defendant's .38 caliber pistol; that the bullet removed from the deceased's body by Dr. Fogel was the same bullet; and, to the identification of the pistol as being defendant's. Thereafter, the State rested its case.

At the close of the State's case, defendant entered her demurrer to the State's evidence which was overruled.

Thereafter, defendant called Mrs. Jacqueline First as her first witness. Mrs. First had been the nurse on duty at the Okmulgee Memorial Hospital Emergency Room, when the victim was brought there. She related that the victim was brought into the Emergency Room about 3:00 or 4:00 in the morning. Concerning what she heard the victim say, she testified "Well, whenever the policeman came in and asked him who shot him, he said 'Betty,' and the policeman asked him a second time and he said, 'Betty did' and then the policeman said, 'Your wife?' And he said, 'Yes,' and then he said, 'I knew she had that gun. I provoked her. It was my fault.'"

On cross-examination, Nurse First said that the victim also voluntarily stated "she was with a neighbor." At that time, Dr. Ross, the policeman, and the ambulance driver were also present. She related further that the victim was wearing a shirt and pants and that they cut the shirt off of him.

After having introduced the testimony of the first witness out of time, defense counsel made his opening remarks at the beginning of the second day of trial. Defendant did not testify in her own behalf, but instead offered the testimony of four witnesses.

Dr. Ernest Ross, a specialist in anesthesia, testified that he was called to the Vassaur residence early on the morning of August 9th; that he discovered Ed Vassaur had been shot and was lying on the gravel driveway; that he determined he was breathing; and, that he immediately called the hospital to alert the Emergency Room. He also testified that he asked Ed Vassaur in the Emergency Room if his wife shot him and he said, "Yes, but I provoked her with accusations and insinuations."

On cross-examination, he said that he thought it was about 3:00 or 3:15 in the morning when he arrived at the residence, but that he didn't look at the clock. He also said that it was 3:45 a. m. when he reached the hospital after being at the

Vassaur residence about three minutes. He said that defendant said to him when she called him, "I shot him. I shot him," and the witness asked "You shot who?" Defendant replied, "Shot Ed." He related that he went into the house to use the telephone and alert the Emergency Room staff; that he did not make a detailed examination of the victim. He said that he had known the defendant about six or seven years; that she was a licensed practical nurse; and, about two years earlier, he took her into surgery. He also stated that he had hunted on the farm owned by defendant's mother. On the morning of August 10th, Dr. Ross prescribed a sedative for defendant.

Defendant called Lucille Hamlen Freeman, the District Court Clerk, who verified that on April 26, 1971, defendant filed a divorce petition against Ed Vassaur, which was pending at the time of the alleged shooting. She also testified that the records did not reflect that a restraining order was ever issued.

The last witness called was Dr. Joel Anderson, who testified that he is the County Medical Examiner; that he was called to the home of defendant's aunt and uncle, Mr. and Mrs. Acker, about 8:30 p. m. on August 9th to examine the defendant. He related that the case history revealed defendant had been involved in an altercation about 3:00 a. m. the same morning; that his examination revealed that she had discoloration under and around the left eye and at the base of the nose; a large blood clot in the back of her head; tenderness in the left temporal area, over her throat and in the large muscles of the neck. She had abrasions of her left knee, a laceration on her left great toe and discoloration above the right knee with some slight tenderness in the back on the lumbar area. He summarized his examination by saying, "She had the appearance emotionally and physically of someone who had been in a fight, who had been beaten and had been beaten severly." Dr. Anderson also related that defendant was slightly disoriented with

tremors of the body, that she would sink into deep depressions, and when she was questioned, she would startle easily. He gave her a sedative and admitted her to the hospital the following morning, but he stated he wanted to admit her to the hospital that night, but she would not go.

It was Dr. Anderson's testimony that the bruises he observed would not become apparent for several hours after they were caused. On direct-examination he was asked, ". . . whether or not these bruises, these evidence of beating would have been shown to a casual non-medical observer within forty-five minutes to an hour after they were received by her?" Dr. Anderson answered, "I doubt it seriously unless he had done a complete medical examination."

On cross-examination, Dr. Anderson stated that the bruises and contusions he described would have caused a great deal of pain. He stated also that the medicine he gave her was tranquilizers and something for pain. The doctor stated that by 8:00 that morning the bruised places would have begun to show and that the history given him by the patient was all that he knew concerning how the bruises came about. However, it was his opinion that the nature of the bruises would indicate that they were caused by a blunt instrument such as a doubled-up fist. He also stated his opinion that the bruises could not have been self-inflicted.

At the conclusion of Dr. Anderson's testimony, defendant rested her case and moved for a directed verdict, which was overruled. The State offered no rebuttal testimony and a short recess was granted to allow counsel to examine the court's instructions for the jury. Defendant offered three instructions which were denied by the court. Thereafter, defendant objected to court's instructions numbered four, five, six, ten, eleven, twelve, thirteen, fourteen and sixteen.

At the conclusion of closing argument, the jury retired to consider their verdict at 1:08 p. m. and at 2:45 p. m. the jury re-

turned with a verdict finding defendant guilty of First Degree Manslaughter and assessed her punishment at four (4) years confinement in the State Penitentiary.

Defendant's motion for new trial was argued before the court on June 19, 1972, and was overruled. Thereafter, judgment and sentence was imposed on defendant, from which this appeal was perfected.

■ Defendant's first proposition asserts: "The defendant was denied a fair and impartial preliminary hearing which materially affected the substantial rights of the defendant." In this defendant contends that the elected prosecutor and his assistants abdicated their role as prosecutor in favor of the special prosecutor who had a pecuniary interest in the results of the preliminary hearing and that the special prosecutor took complete control of the preliminary hearing contrary to law.

The preliminary Information was filed by the elected District Attorney, charging the offense of First Degree Manslaughter. However, after reviewing the transcript of preliminary examination, there is no doubt but that the special prosecutor was permitted to take complete control of the preliminary examination, over defendant's objection, and that the elected prosecutor and his assistants did abdicate their role, notwithstanding the fact that some representative of the District Attorney's office, or the Attorney General's office, was always present. The original record reflects that certain pleadings filed by the special prosecutor were signed by him, even though they were filed on behalf of the District Attorney, and that the entire preliminary examination was conducted by the special prosecutor, even prior to the disqualification of the District Attorney and his assistants, and toward the end of the preliminary examination, the special prosecutor admitted to the magistrate that he was involved in the "civil phase" of this matter, i. e., distribution of the deceased's insurance funds.[1] But notwithstanding these facts, the single question presented by these circumstances at the preliminary hearing is: "Was the defendant prejudiced thereby?" We must conclude that no prejudice has been shown by defendant to have resulted from the preliminary examination. From a discovery point of view, the defendant was afforded the opportunity to learn all the State's evidence, and she was thereby afforded full discovery of testimony, except for certain sworn statements, most of which were later furnished. There is no doubt also, that had the trial judge failed to remove the special prosecutor, and had the special prosecutor been permitted to conduct the trial in the same manner as the preliminary hearing was conducted, such complaint would have been sufficient to reverse this conviction. Commencing at page 941, in Born v. State, 397 P.2d 924 (1964), this Court set forth numerous criminal cases in other jurisdictions which preclude one from acting as special prosecutor, who has a pecuniary interest in the outcome of the criminal trial. Also, the existing statutes do not provide for the services of a special prosecutor, other than the services of the State Attorney General to serve as a special prosecutor. However, this Court stated in Born v. State, supra:

"A thorough review of the record does not reveal prejudice on the part of the special prosecutor sufficient to constitute reversible error."

We reach the same conclusion in the instant case, especially since the special prosecutor's participation only occurred at the preliminary examination. There was sufficient evidence shown at the preliminary hearing to warrant the examining magistrate's action in binding defendant over for trial. We have reviewed all the cases cited by defendant and distinguish them from the instant case in that in these cases, the special prosecutor improperly participated during the trial. Such condition does not exist in the instant case.

■ Under the first proposition, defendant also complains of the continuance

1. See page 197, Vol. I of the transcript of testimony.

granted the prosecution, because of the special prosecutor's late entry into the case and because the magistrate later granted a second continuance from October 4th to October 8th, 1971. Again, defendant fails to show how she was prejudiced by the magistrate's action. Likewise, the wide latitude allowed in the admission of evidence at the preliminary examination did not prejudice the defendant; instead, it worked as favorably to her as it did for the prosecution. We therefore conclude that defendant's first proposition is without merit.

The defendant, in her second proposition of error, contends that she was denied the right to a speedy trial as provided for in the United States and Oklahoma Constitutions.

■ First, this Court finds that there was not an unreasonable delay between the preliminary hearing and the date of trial. The factors to determine an unreasonable delay were set forth in Wilson v. District Court of Oklahoma County, Okl.Cr., 471 P.2d 939 (1970):

"Generally, as to whether a delay in trial has denied accused the right to a speedy trial, the relevant factors for consideration are length of the delay, the cause of the delay, any waiver by the defendant, and prejudice to defendant."

■ In Snow v. Turner, Okl.Cr., 406 P.2d 509 (1965), Judge Nix said that good cause exists when there is "some 'legal reason' or delay caused by operations of the 'rules of law.'" In the instant case, we find that there was good cause as set forth in *Snow,* supra. In the instant case that legal cause initially existed in the erroneous decision of the examining magistrate, which was clarified by this Court's Order of November 16, 1971. Likewise, the special jury panel for the Brinlee trial falls under the current administrative provisions of the law. That trial was conducted under special direction and was outside the exclusive administrative control of the District Court of Okmulgee County. In addition, defendant has failed to show how she was prejudiced by the alleged delay in trial. As this Court said in Kuerschner v. State, Okl.Cr., 493 P.2d 1402 (1972), "the defendant has failed to meet the burden assigned to him of showing what prejudice, if any, attached to him as a result of this delay." We therefore conclude that defendant in the instant case has not shown such prejudice to exist; but neither we do not find defendant waived any right to which she was entitled nor do we find that she was denied a speedy trial.

This Court has previously held in the case of Wilson v. District Court of Oklahoma County, Okl.Cr., 471 P.2d 939 (1970), as follows:

"Generally, as to whether a delay in trial has denied accused the right to a speedy trial, the relevant factors for consideration are length of delay, the cause of the delay, any waiver by the defendant, and prejudice to defendant. State v. Johnson, 275 N.C. 264, 167 S.E.2d 274 (1969). United States v. Roberts, 293 F.Supp. 195 (S.D.N.Y.1968), United States v. Simmons, 338 F.2d 804 (2nd Cir., 1964); United States v. Velez-Arenas, 299 F.Supp. 463 (D.P.R.1969)."

In the instant case, defendant was free on bond and was not incarcerated in jail and when the delay is considered, even under the Snow v. Turner rule it was not excessive.

■ Defendant's third proposition of error alleges that she was denied the right to sworn statements as provided under 22 O.S.1971, § 749, which reads in part:

"A. In the investigation of a criminal offense, the district attorney or any peace officer may take the sworn statement of any person having knowledge of such criminal offense. Any person charged with a crime shall be entitled to a copy of any such sworn statement upon the same being obtained."

This Court finds some merit in the defendant's contention that the special investigator was in some fashion working with the State, although indirectly. The above statute would apply in this instance. However, in examining this case upon its own

merits, we cannot find any prejudice to the defendant as alleged in her brief for the following reasons.

The Attorney General's statement to the court, in reference to sworn statements not furnished the defendant, that "if such statements were taken and if there are any other statements which were not named, the State does not know of them and has never seen them." Therefore, if the State did not have any other such statements, then they could not have been used by the Attorney General at the trial and therefore, did not result in any prejudicial way to the defendant. It should also be pointed out that all of the statements of those who were witnesses at the trial were furnished to the defendant prior to the trial.

It should furthermore be noted that the Attorney General offered his complete file to the defendant's attorney to determine if there were any statements in the file that had not been given to them previously, but the defendant's attorney never accepted the offer.

■ The defendant also contends that it was error to allow the State to furnish statements of Esten Milligan to them just prior to trial and that they did not have time to read them before cross-examination, thus being prejudicial to the defendant. As to the testimony of Esten Milligan, we find no merit in this contention. Close examination of his testimony will reveal that it was mostly cumulative and not necessarily material in the case. Some conflict was shown between his testimony and that of his brother in that he related they heard the shot and screams before they went into the back bedroom. Kenneth Milligan had related they went into the bedroom and then heard the shots and screams. Under these circumstances there was not any prejudice shown by the defendant.

■ In reference to the statements taken of Beatrice Cook and given to the defendant just prior to trial, we find again that no prejudice resulted to the defendant. Although the statements were given to the

defendant only minutes before trial, it should be noted that the State did not call Beatrice Cook as a witness. Also defendant knew of Mrs. Cook's connection to the case and could have ascertained all the facts she knew without the statement.

The defendant's attorney contends that her statements were favorable to the defendant, yet he had one night in which to review the rather short transcript and call her the following day as his witness, but failed to do so.

■ The defendant in her fourth proposition of error alleges that the court erred in receiving the testimony of Kenneth D. Milligan, whom she claims was a self-committed perjuror.

The applicable statute is 21 O.S.1971, § 506, which reads in part as follows:

"No person who has been *convicted of perjury,* or of subornation of perjury, shall thereafter be received as a witness in any action, proceeding or matter whatever upon his own behalf; not in any action or proceeding between adverse parties against any person who shall object thereto . . ." (Emphasis added)

The defendant has not presented any evidence to this Court to show any prior conviction of perjury by the witness. Although Milligan did make two different statements under oath, it goes only to his credibility which the jury is to weigh.

In the case of State of Washington v. Ledford, 195 Wash. 581, 81 P.2d 830, at page 831 (1938), the court stated of the opinion the following:

"Even in such cases, it seems to be the rule that perjury will not be predicated upon the false statements corrected before the submission of the case in which made."

Defendant's fifth proposition of error alleges that the arguments of the prosecuting attorneys were designed to raise the passion and prejudice of the jury to cause them to act in an improper manner; that the arguments were designed to convey to

the jury something that was untrue or not capable of being proved and which it was known the evidence would not support; and, that the arguments were made in bad faith and were manifestly prejudicial.

In this defendant asserts that the assistant prosecutor's opening statement when she said, "Ken Milligan and this defendant then went into the white house and proceeded to go to bed and have sexual relations." was so highly prejudicial that it could not be cured by the court's admonition to the jury. Notwithstanding the trial court's statement at the pretrial conference that the extra-marital relations would not be gone into, this fact was part of the res gestae as defined by this Court in Martin v. State, Okl.Cr., 449 P.2d 275 (1969), wherein it was held:

"It is not possible to define the term 'res gestae' by any exact definition which will fit all cases. The term in a general way may be defined as the circumstances, facts, and declarations which grow out of the main fact and shed light upon it and tend to explain it, are voluntary and spontaneous, and made at a time so near, either prior or subsequent to the main act, as to exclude the idea of deliberation or fabrication." Dodd v. State, 29 Okl.Cr. 311, 233 P. 503 (1925)

Being part of the res gestae, error now complained of cannot be predicated upon the assistant prosecutor's statement, notwithstanding the pretrial agreement. There was not at the time of trial, nor can there be, any allegation of another crime, i. e. adultery, in this regard and under these facts. The court properly admonished the jury to disregard the statement and admonished the attorneys not to refer to the fact again.

The defendant contends the assistant prosecutor's comments, with reference to what Dr. Ross did when he arrived at the scene, were not borne out by the testimony and may have prejudiced the jury and that from the opening remarks, it appears that the assistant prosecutor was attempting to discredit the prospective testi-

mony of Dr. Ross or to create unfavorable implications. The assistant prosecutor's opening statement recited:

"Doctor Ross got out of his car, walked by the deceased, did not touch him, did not treat him did not talk with him, stepped over him and went into the defendant's house and into Betty Vassaur's house. The ambulance had arrived. Doctor Ross came out, got into his car, did not talk to the ambulance drivers. The ambulance drivers loaded Ed Vassaur into the ambulance and they took him to the hospital."

However, when Dr. Ross testified, he gave explanations of his professional evaluation of the situation: his determination that the victim was alive, that his breathing passage was clear, and that he could render little medical assistance at the scene. Knowing that the ambulance was arriving, he went into the house to telephone the emergency staff to alert them to the situation. Likewise, the testimony of Officer Carter and Officer Sullivan supported the testimony of Dr. Ross. Consequently, it is contended that the assistant prosecutor's opening statement was misleading, whether intentional or not.

In Nolan v. United States, 10 Cir., 423 F.2d 1031, cert. denied, 400 U.S. 848, 91 S. Ct. 47, 27 L.Ed.2d 85 (1969), the court held:

"Where prosecution stated that it would prove certain facts but failed to do so after an adverse trial court ruling, where it subsequently noted failure in its closing argument, any possible confusion which may have been created by unfulfilled statement was thus corrected."

This Court finds that in the prosecuting attorney's closing argument she made reference to the fact that it was the testimony that Dr. Ross looked at the body in some manner and did not completely neglect the deceased as stated in her opening argument. Therefore, under Nolan, supra, this contention is without merit.

Defendant also complains that the prosecutor's closing argument was prejudi-

cial and unsupported by the evidence when she argued that the weapon was fired from long range because there were no powder burns on the deceased's body when Dr. Fogel performed the autopsy. One of the explanations given by Dr. Fogel for the absence of powder burns was that any clothing worn by the deceased man could have absorbed the powder. A comparison may be made between the instant case and Cole v. State, Okl.Cr., 467 P.2d 511 (1970) in which this Court reversed the murder conviction because the State failed to produce the clothing worn by the deceased man which would have verified the State's contention that the pistol was fired at close range. In the instant case, none of the deceased man's clothing was introduced by the State.

This Court distinguishes *Cole*, supra, from the instant case for several reasons. In *Cole*, supra, the defendant completely denied the shooting, therefore, the State was left with the burden of showing beyond a reasonable doubt that the defendant was guilty of the crime charged. In the *Cole* case, the prosecution had in its possession the shirt worn by the deceased at the time of death. The defendant pled that the deceased had shot himself and that if the shirt were admitted into evidence that it would reveal powder burns. Since the State could have easily produced the shirt, and did not do so at trial, the defendant's argument of suicide by the deceased stood unrefuted by the evidence and therefore, the conviction was reversed. The State had not met its burden of proof to reasonably show that the defendant was guilty of a crime.

In the instant case, the defendant admitted the shooting of the deceased and pled self-defense. This established the corpus delicti of the crime and after the State introduced the statements of certain witnesses connecting defendant with said crime, the State met its burden of proof and the burden shifted to the defendant to show that it was justifiable or excusable homicide.

In the instant case there were several statements, made by the defendant, introduced into evidence that reasonably tended to show the defendant was guilty of the crime charged. It was the testimony of Officer Carter that, "She [defendant] told me that she didn't mean to hit him, that she was just trying to scare him."

Title 21 O.S.1971, § 711, defines Manslaughter in the First Degree in part as:

"2. When perpetrated without a design to effect death, and in a heat of passion, but in a cruel and unusual manner, or by means of a dangerous weapon; unless it is committed under such circumstances as constitute excusable or justifiable homicide."

A comparison of the defendant's statement as testified to by Officer Carter and the above statute clearly shows defendant guilty of the crime if such were true. The statement was never contradicted or challenged by defense counsel.

It was also the testimony of Kenneth Dale Milligan that the defendant made the statement, "I heard that you been looking for me, but I'm going to kill you first." This clearly indicated that the defendant might have been charged with a higher degree of homicide because it shows some design to effect death, but since the charge was reduced to Manslaughter by order of this Court, for reasons previously stated, we hold that this statement was sufficient to reasonably tend to show defendant guilty of the crime of Manslaughter.

Dr. Fogel testified on direct-examination, "[I]f the subject was wearing any outer garment, it is conceivable that the powder would be deposited on such a garment and be wiped off, so to speak, prior to striking the surface of the body." The assistant prosecutor argued in her closing argument, concerning what Dr. Fogel testified with reference to the absence of powder burns, "Now, you heard Doctor Fogel testify that there weren't any powder burns on the arm or here on the chest. He said that there would have been, there would

■■■■■■■■■

have been had there not been a lot of clothing."

■■■ Defendant also asserts that the chief prosecutor's closing argument was an attempt to include evidence into the record of trial by way of argument. The Attorney General cites Battle v. State, Okl.Cr., 478 P.2d 1005 (1970), wherein this Court stated:

"The right of argument contemplates a liberal freedom of speech, and the range of discussion, illustration and argumentation is wide . . . It is only when argument by counsel for the State is *grossly improper* and unwarranted upon some point which may have affected defendant's rights that a reversal can be based upon improper argument." (Emphasis added)

This Court said in Lee v. State, Okl.Cr., 485 P.2d 482 (1971):

" . . . Defendant complains of remarks made by the District Attorney in his closing argument, and asserts that those remarks constituted reversible error. In several instances complained of by Defendant, no objection was made at the time the remarks were made, and in those which objections were made, the court properly instructed the jury to disregard them. Certain other of the remarks complained of by Defendant were clearly statements made in response to Defense Counsel's arguments, and in such circumstances they do not constitute reversible error."

It is clear to this Court that if this statement by the prosecuting attorney was so "grossly improper," as called for under *Battle,* supra, it would have at least merited an objection by defense counsel, but a review of the record shows no objection.

It should also be noted that at six different times throughout the prosecuting attorney's closing arguments, the court reminded the jury not to pay any attention to the arguments of counsel unless they found it based on the evidence. Therefore, under *Lee,* supra, we find there was no prejudice shown by the defendant.

Defendant's sixth proposition asserts and argues that the prosecution placed defendant's character at issue by the reference to extra-marital relation when witness Ken Milligan testified, but we do not accept this contention. Defendant cites Bean v. State, 77 Okl.Cr. 73, 138 P.2d 563 (1943), to support her contentions, but that case is distinguished from the instant one on the facts and the remoteness in time of the alleged sexual actions referred to in *Bean,* supra, do not appear in the instant case.

The last proposition asserts that the trial court erred in not sustaining defendant's demurrers, motion for acquittal and directed verdict, and that the verdict is not supported by the evidence. In this defendant asserts that considering the State's evidence alone, it is shown that defendant was severely beaten by her husband and that she acted in self-defense.

In support of this contention, defendant cites Jones v. State, 20 Okl.Cr. 233, 202 P. 187 (1921). In that case, this Court recited:

"Where the homicide is admitted and proven, as in this case, there is no shifting of the burden of proof, where the circumstances proven on the part of the state reasonably tend to show that the fatal acts may have been done in self-defense."

A close examination of the transcript will reveal that the State's evidence shows that there was not a severe beating as the defendant contends. It was the testimony of Officers Carter, Sullivan and Rickman that the defendant was not physically abused, with the exception of a stubbed toe and a small bruise on her arm and there was not any connection made between these lesions and a struggle with the deceased. Only one State's witness (Kenneth Dale Milligan) testified that the defendant was struck by blows from the deceased, but in no way indicated the seriousness of the same. We cannot, therefore, reach the same conclusion that all of the State's evidence showed a severe beating as contended by the defendant.

**685**

Defendant cites 21 O.S.1971, § 731, in part defining excusable homicide:

"2. When committed by accident and misfortune in the heat of passion, upon any sudden and sufficient provocation, or upon a sudden combat provided that no undue advantage is taken, *nor any dangerous weapon used,* and that the killing is not done in a cruel or unusual manner." (Emphasis added)

The defendant again makes reference to the statement testified to by Officer Carter in which the defendant stated that she didn't mean to hit him, but only meant to scare him. The defendant alleges that this tends to establish by the State's own case that the incident was an accident and that this fact coupled with the testimony concerning the alleged beating defendant suffered reveals that the misfortune resulted in the heat of passion and that there was also sufficient testimony to show the existence of sudden and sufficient provocation, over a relatively short period of time, as defined in the foregoing statute.

This Court has examined the above statute and found that it does not have any standing before this Court for the reason that a dangerous weapon was used in the instant case which would render this statute inapplicable under the circumstances.

In reference to the defendant's contention of the fatal act being an accident, this Court held in Elix v. State, 77 Okl.Cr. 45, 138 P.2d 139 (1943):

"Whether the homicidal act was the result of accident must be gathered from all the circumstances surrounding the transaction and is a question for the jury to determine."

In the case of Enoch v. State, Okl.Cr., 495 P.2d 411 (1972), this Court held that:

"Where the evidence, although conflicting, was sufficient to support a verdict of either justifiable homicide or manslaughter, and where the court properly instructed as to the law regarding both those offenses, defendant's demurrer was properly overruled; and Court of Criminal Appeals was bound by the jury's determination on the conflicting evidence that defendant, in fatally stabbing the decedent, did not act in self-defense."

We consequently hold that there was a proper question for the jury, that they were properly instructed and that this Court is bound by the jury's verdict and therefore, all demurrers, motions for acquittal and directed verdicts made by the defendant were properly overruled.

For all of the above reasons, we are of the opinion that the judgment and sentence appealed from, should be, and the same is hereby, affirmed.

However, considering all the facts and circumstances concerned in this case, and the conditions now prevailing at the State Penitentiary, defense counsel is admonished to consider the provisions of 22 O.S. 1971, § 994, for consideration by the trial court.