James Scott BAUHAUS, Appellant,

v.

The STATE of Oklahoma, Appellee.

No. F–74–535.

Court of Criminal Appeals of Oklahoma.

Feb. 19, 1975.

Robert S. Durbin, Deputy Chief Public Defender, Tulsa County, for appellant.

Larry Derryberry, Atty. Gen., James L. Swartz, Asst. Atty. Gen., David O'Brien, Legal Intern, for appellee.

## OPINION

BUSSEY, Judge:

Appellant, James Scott Bauhaus, hereinafter referred to as defendant, was charged, tried and convicted in the District Court, Tulsa County, Case No. CRF–73–24, for the offense of Murder in violation of 21 O.S.1971, § 701(1). The jury fixed his punishment at Life imprisonment, and from this judgment and sentence his appeal has been perfected to this Court.

At the trial, the first witness called for the State was Dr. Robert Fogel, Director of Laboratories and Chief Pathologist at the Oklahoma Osteopathic Hospital in Tulsa, who testified as an expert in forensic pathology. This witness established that on October 17, 1972, he performed an autopsy upon the body of Jefferson Dee Hunt, and that death was the direct result of a bullet wound to the chest inflicted at moderately close range. The extracted bullet was initialed and released to D. A. Roberts, with the Tulsa Police Department.

The second witness to testify was Dorothy Hunt, the widow of Jefferson Dee Hunt. She identified the defendant as the person who shot her late husband when she and the victim returned to their residence in Tulsa at about 2:45 p. m. on October 17, 1972. She further related that upon dis-

covering the defendant in their residence, her husband approached him and asked for the gun which the defendant held in his hand. The gun discharged when her husband was close to the defendant, and her husband fell to the floor unconscious. The defendant then dropped the gun, stepped over her husband, hesitated a moment, and then ran out the back door breaking the glass in the storm door as he fled. She then telephoned for the police and an ambulance, and found that the residence had been ransacked. The witness also identified State's Exhibit No. 1 as the gun which her husband had kept loaded in their bedroom.

The next witness for the State was Mrs. Jack Baker, who identified the defendant as the person she had seen running quite fast and repeatedly examining his left arm shortly after 2:35 p. m. on October 17, 1972, while she was parked in her automobile.

The fourth witness for the State was D. A. Roberts, a Police Officer with the Tulsa Police Department assigned to the Homicide Division. This witness identified State's Exhibit No. 2 as the bullet he had received from Dr. Robert Fogel.

The next witness was Bill Yarbrough, a Police Officer with the Tulsa Police Department assigned to the Identification Division. This witness identified State's Exhibit No. 1 as a .22 caliber Ruger revolver found at the scene of the crime, State's Exhibits Nos. 3 through 19 as photographs of that scene, and State's Exhibit No. 21 as a screwdriver also found in a bedroom at that location. Also, the witness established that the end of the screwdriver was of the same width as pry marks appearing on the backdoor frame of the victim's residence, and had paint chips on it resembling the paint on the door frame.

The final witness for the State was Jess McCullough, a Police Officer with the Tulsa Police Department also assigned to the Homicide Division, who testified as the chief investigating officer in this case. He first overheard a radio dispatch regarding the offense at 2:39 p. m. on October 17, 1972, whereupon he proceeded to the victim's residence. There he observed what appeared to be blood spots near the backdoor, upon the chain link fence in the back yard, and upon the sidewalk leading to where Mrs. Jack Baker was parked two blocks away. To the knowledge of this witness, no blood specimens had been analyzed, and although numerous latent fingerprints were found at the scene of the crime, none matched those of the defendant.

Judy Cole testified as the only defense witness that the defendant was her husband's cousin, and that shortly after 2:00 p. m. on the date of the subject offense, the defendant came alone to their home to visit and remained there until about 10:00 p. m. that evening. This witness fixed the time by reference to a television program, and the date because she had just returned from shopping with a girlfriend for a birthday present in preparation for the birthday of her friend's father the next day. Also, the witness testified that she did not at this time observe any cuts or injuries on the defendant. On cross-examination she testified that she was alone with her small child when the defendant arrived, but that her husband then arrived shortly before 5:00 p. m. Also the girlfriend and her husband came to visit at about 5:30 p. m. and remained until the defendant departed. Her testimony also established that she had contact with each of these other people shortly prior to trial and knew their whereabouts, and that they were available locally. This witness further testified that she first learned the defendant was charged with this offense while reading the Tulsa Tribune in the latter part of November or early part of December, 1972. That same evening she advised the defendant's father where he had been on October 17, 1972, however, she did not report this alibi to any law enforcement authorities until about a week before trial.

The defense then rested and Lucille Towry was called by the State as the only rebuttal witness. This witness testified that

she was Librarian for the Newspaper Printing Corporation, and that her duties included the care and custody of newspaper articles for both the Tulsa World and Tulsa Tribune. She further testified that she had brought with her newspaper clippings concerning the subject homicide. Although she had not specifically examined all these articles, she testified that none of those concerning the death of the victim mentioned the name of the defendant, and none concerning the defendant mentioned that he was charged with the murder of this victim.

In rebuttal the State was also permitted to introduce the preliminary Information as State's Exhibit No. 22 for the purpose of establishing that the defendant was not charged herein until after the alibi witness purportedly read of the charges in the newspaper. No further evidence was introduced in behalf of the defendant.

The defendant asserts in his first proposition of error that the trial court erred in failing to dismiss the charge on the grounds that he was denied his right to a speedy trial under the Sixth Amendment to the United States Constitution and Article II, Section 20 of the Oklahoma Constitution.

The preliminary Information herein was filed January 3, 1973, and a warrant was issued the same day. However, not until April 9, 1974, did the State cause a Writ of Habeas Corpus Ad Prosequendum to be issued, and the defendant was brought before the trial court the following day from Osage County where he had been held on unrelated charges. The defendant readily admits that the prosecution then proceeded with expediency, but contends that the failure of the State to undertake to secure his appearance from Osage County during the 15 month period prior thereto resulted in a denial of his right to a speedy trial.

At the hearing on the defendant's motion to dismiss, the Assistant District Attorney admitted that his office was aware the defendena was previously being held in the Osage County jail on unrelated murder charges, but asserted that the defendant had been engaged in lengthy hearings there, that to shuffle the defendant between the two adjoining counties on separate murder charges would have interfered with the defendant's right to a fair and impartial trial, and that the defendant had not previously requested that this charge be set for trial.

The principles and guidelines for resolution of this proposition were set forth in Barker v. Wingo, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). Here, the United States Supreme Court recognized the unique and amorphous nature of the right to a speedy trial as compared to other constitutional guarantees. This is for the reason that both society and the defendant have an interest in the prompt disposition of criminal proceedings, deprivation of the right may, however, be advantageous to the defendant, and being incapable of quantification, there is no precise point at which the right is denied. In the application of the right the court then rejected as inflexible, both the fixed time period approach since this would require more than the Constitution, and the demand waiver approach for the reasons hereinafter discussed, and seized upon a functional analysis approach to each case, and stated at pages 530 and 533, 407 U.S., at pages 2191–2193, 92 S.Ct.:

"The approach we accept is a balancing test, in which the conduct of both the prosecution and the defendant are weighed.

"A balancing test necessarily compels courts to approach speedy trial cases on an ad hoc basis. We can do little more than identify some of the factors . . .. Length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant.

\* \* \* \* \* \*

"We regard none of the four factors identified above as either a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial. Rather, they are related factors and

must be considered together with such other circumstances as may be relevant. In sum, these factors have no talismanic qualities; courts must still engage in a difficult and sensitive balancing process." (Footnotes omitted)

We will here consider the length of delay and the reason for the same together. In this regard, the State has supplemented the record here with certified copies of the appearance docket in Case Nos. CRF–72–801 and CRF–72–803 of the District Court, Osage County. These reveal that the defendant was arrested and then had his initial appearance before the trial court in each case on October 24, 1972, at which time bond was set on charges of Robbery With Firearms in the former case and bond was denied in the latter on charges of Murder. Thereafter, as to this defendant, these records indicate that there were extensive proceedings from month to month in these two cases, except during the period from November 13, 1973 to February, 1974.

Following his arrest on the Osage County charges, the defendant was committed for mental observation on October 26, and not returned to local custody until on or about December 19, 1972. Although these records are to some extent illegible, they indicate that there were at least 14 distinct continuances of the preliminary hearing in the murder case before the defendant was bound over for trial on August 1, 1973. Also, testimony spanning a total period of about six to nine days was received prior to further continuance in connection with at least three of these continuances. These records further indicate that at least four of these continuances were necessitated by reason of the defendant's commitment for mental observation and the absence of a transcript, and at least five others were either on motion of the defendant or with his agreement. Likewise, there appears to have been at least ten continuances of the preliminary hearing on the robbery charge before the defendant waived preliminary hearing on November 13, 1973 and entered

a plea of not guilty. The first two of these were also necessitated by reason of defendant's mental commitment, then on April 2, 1973, the defendant requested that the preliminary hearing in this case be delayed until after such hearing in the other case. Of the remaining six continuances, at least four were either on motion of the defendant or with his agreement. At least a portion of these continuances were probably necessitated by reason of defendant being appointed a new attorney on August 16, 1973, with his agreement. The defendant then had his arraignment on the Murder charge the same day, and this case appears to have been first set for jury trial in October, 1973, but was then stricken on defendant's motion. Both cases were apparently then set for trial in February, 1974, but on March 18, 1974, the defendant waived jury trial in each case. On April 4, 1974, he then entered a plea of guilty in both cases and was sentenced to 15 years imprisonment on the Robbery charge and a like sentence to run concurrent in the other case on reduced charges of First Degree Manslaughter.

■ Generally, the speedy trial provisions are triggered by formal charge or actual arrest whichever occurs first. United States v. Marion, 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971). Since the office of the District Attorney was aware of the defendant's detention elsewhere and would undoubtedly have had him arrested if released from custody in Osage County, the speedy trial provisions were here engaged upon the filing of the Information. Mere incarceration in even another jurisdiction will not absolve the prosecuting authority of responsibility for undertaking reasonable effort to secure the presence of the defendant for trial, although demand for trial and prejudice from lengthy delay may weigh heavily in such situations. Smith v. Hooey, 393 U.S. 374, 89 S.Ct. 575, 21 L.Ed.2d 607 (1969) and Dickey v. Florida, 398 U.S. 30, 90 S.Ct. 1564, 26 L.Ed.2d 26 (1970). However, while rejecting the contention that the commission of a crime

when at liberty on bail constitutes a waiver of the right to speedy trial on the former charge, the court in United States v. Canty, 152 U.S.App.D.C. 103, 469 F.2d 114 (1972) stated:

"[T]hat fact necessarily supplies some justification for at least part of the delay. When a defendant commits a crime elsewhere while out on bail, he must expect to incur at least the delays inevitably attendant on the other jurisdiction's instituting criminal proceedings against him, e. g., the time spent on preliminary hearings, grand jury proceedings, trial preparation, and trial itself. . . . Whether appellant's prosecution here could have been undertaken without interrupting proceedings [elsewhere] is speculative, but, absent unusual circumstances, we do not think that one jurisdiction is required to compete with another for the privilege of proceeding against a defendant first." (Footnote 3 at page 119)

To the extent that the prosecutor here simply anticipated that adverse publicity might accrue to the defendant, we do not find any merit to the speculative claim of the State that to transfer the defendant between the two adjoining counties on separate murder charges would have interfered with his interest in a fair and impartial trial. Prejudice in this regard could have been cured by a change of venue, and in any event this is a right peculiar to the defendant and not a valid reason for delay by the State. However, except during only the two and one half to three and one half month period between November 13, 1973 and February, 1974, we do observe that the defendant was engaged in considerable and extended court proceedings during the 15 month period that he was detained in Osage County, which would have made his transfer between the two counties strenuous at best without interrupting proceedings in one or the other.

In discussing these two factors, the United States Supreme Court in Barker v.

Wingo, supra, stated in part at pages 530 and 531, 407 U.S. at page 2192, 92 S.Ct.:

"[B]ecause of the imprecision of the right to speedy trial, the length of delay that will provoke such an inquiry is necessarily dependent upon the peculiar circumstances of the case. . . .

"Closely related to length of delay is the reason the government assigns to justify the delay. Here, too, different weights should be assigned to different reasons. A deliberate attempt to delay the trial in order to hamper the defense should be weighed heavily against the government. A more neutral reason such as negligence or over-crowded courts should be weighed less heavily [against the government] . . . . Finally, a valid reason, such as a missing witness, should serve to justify appropriate delay."

Since the vast majority of the delay here was inevitably and legitimately attendant to legal proceedings on another offense and brought about by the defendant, we would characterize at least that portion as appropriate delay justified by valid reason.

The defendant readily admits here that he did not communicate any demand or request for trial. However, he directs our attention to State ex rel. Trusty v. Graham, Okl.Cr., 525 P.2d 1231 (1974), wherein we recognized and applied these four factors, but in discussing the defendant's assertion of his right we quoted with approval from Brummitt v. Higgins, 80 Okl. Cr. 183, 157 P.2d 922 (1945), as follows:

"[I]f the defendant is not on bail, the law makes the demand [for trial] for him and the prosecution has the burden of showing that the trial was delayed for some lawful cause."

The United States Supreme Court in Barker v. Wingo, supra, rejected the demand-waiver doctrine as an unsatisfactory approach to the application of the right to speedy trial, and held that the defendant's assertion of his right is a distinct factor to be considered, with pre-trial incarceration being considered in connection with preju-

dice to the defendant. Among other reasons, the court recognized that the doctrine presumes the waiver of a fundamental right, is also inconsistent with the interests of society, and emphasized that the primary burden is upon the courts and the prosecutors to bring the accused to trial. The court was of the opinion that the above approach would permit appropriate weight to be given the total circumstances of the case and adjustment for dealy attributable to the defendant. The United States Supreme Court here clearly indicated the weight to be placed upon demand in assessing the other factors and in determining the extent of deprivation by stating:

"We emphasize that failure to assert the right will make it difficult for a defendant to prove that he was denied a speedy trial." at page 532, 407 U.S. at page 2193, 92 S.Ct.

Our approach to the application of the demand factor in State ex rel. Trusty, supra, therefore represented an extension of the speedy trial right as now recognized under the Sixth Amendment to the United States Constitution. We effectively eliminated a consideration of the defendant's assertion of his right where he has been held in jail pending bond, when pretrial incarceration must be considered in connection with prejudice anyway. Certainly, the corollary to the demand-waiver doctrine would no longer be permitted, i. e. that a defendant free on bond waives his right to speedy trial absent a demand therefor. However, whether we would continue such an approach we need not now decide since the reason for the rule is not present here. This is because the defendant's pretrial incarceration in Osage County occurred irrespective of the subject charge and the defendant was not in custody pending bond of this offense.

With regard to prejudice to the defendant, the United States Supreme Court in Barker v. Wingo, supra, stated at page 532, 407 U.S., at page 2193, 92 S.Ct.:

"Prejudice, of course, should be assessed in the light of the interests of defendants which the speedy trial right was designed to protect. This court has identified three such interests: (i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired. Of these, the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." (Footnotes omitted)

Also, that court has emphasized that Barker v. Wingo does not require an affirmative demonstration of prejudice as a requisite to a claim of denial of the right to speedy trial, and prejudice is not limited to prejudice to the defense of the accused. Moore v. Arizona, 414 U.S. 25, 94 S.Ct. 188, 38 L.Ed.2d 183 (1973).

We have already noted that the defendant's pretrial incarceration here was not attributable to the subject offense. However, in discussing oppressive pretrial incarceration where a defendant is already incarcerated elsewhere, the United States Supreme Court in Smith v. Hooey, supra, stated at page 378, 393 U.S., at page 577, 89 S.Ct.:

"First, the possibility that the defendant already in prison might receive a sentence at least partially concurrent with the one he is serving may be forever lost if trial of the pending charge is postponed. Secondly, under procedures not widely practiced, the duration of his present imprisonment may be increased and the conditions under which he must serve his sentence greatly worsened, by the pendency of another criminal charge outstanding against him." (Footnotes omitted)

However, even these circumstances are not appropriate here. Under Oklahoma law and procedure a concurrent sentence on both the subject charge and the Osage County charges would have been legally

impossible. Since the defendant was not actually serving a sentence, the duration of his incarceration was not increased as he was not eligible for parole, and there is no reason to conclude that the conditions under which he was held were worsened.

Undoubtedly, the defendant may have suffered some anxiety and concern by virtue of the present charge, just as one free on bond pending trial may suffer restraint upon his liberty and the inevitable consequences of public accusation. However, since the defendant was not at liberty on bond from the Osage County charges anyway, any additional prejudice here would certainly seem to be minimal.

The defendant does urge that his defense was impaired because only one of several possible alibi witnesses was called for trial. However, the record reflects that this alibi witness had no difficulty in recalling pertinent events, and by her own testimony there were no other alibi witnesses at the crucial time involved and the other witnesses who might establish the defendant's whereabouts shortly thereafter were readily available within the community.

Although the delay here was considerable, in view of the reason therefor, the absence of demand, and only minimal prejudice, we hold that the defendant was not deprived of a speedy trial and that this proposition is without merit. The cases relied upon by defendant are either readily distinguishable or not in point.

■ In the second and final proposition of error the defendant contends that the trial court erred in allowing the prosecutor to make improper examination and comments. Although the defendant makes several assignments of error under this one proposition, we will discuss only those properly preserved for review by this Court, and observe that the deleted assignments were not fundamentally prejudicial. As stated by this Court in Neal v. State, Okl.Cr., 506 P.2d 936 (1973):

"It is a well established rule that when an objectionable statement is made by the prosecution, it should be called to the attention of the court by timely objection, together with a request that the jury be instructed to disregard the improper statement and in the event that the objection is overruled, an exception should be taken to the ruling of the court, preserved and argued in the Motion for New Trial. When this is not done, the defendant is deemed to have waived any objection unless the remarks are so fundamentally prejudicial that the court cannot, by instructions to the jury, correct such error." at page 941.

■ Under this proposition the defendant first argues that fundamental error was committed when the prosecutor cross-examined the defense witness, Judy Cole, regarding her belated report of the alibi to law enforcement officials, and when the prosecutor commented thereon in closing argument. The contention of the defendant is that such examination and comment at least inferentially infringed upon his right to remain silent under the Fifth Amendment to the United States Constitution, and Article II, Section 21 of the Oklahoma Constitution. In support of this assignment, the defendant cites, among other cases, Buchanan v. State, Okl.Cr., 523 P.2d 1134 (1974), however, each of these cases are clearly distinguishable for the reason that they involved cross-examination or comment on pretrial silence of the accused, and not third persons. This Court has recently held that the constitutional guarantee against self-incrimination and right to remain silent is a personal privilege which does not vicariously extend to the pretrial silence of third persons. Glover v. State, Okl.Cr., 531 P.2d 689 (1975) and Wright v. State, Okl.Cr., 531 P.2d 696 (1975).

■ During redirect examination of Mrs. Jack Baker, and after she had previously testified that she in part identified the defendant by virtue of the "cleft" between his chin and lips, the prosecutor effectively asked if the defendant now had

the same "cleft" that he had on the date of the crime. (Tr. 85) Although the court overruled an objection to the question, the record reveals that the witness did not answer. The defendant then moved for a mistrial urging that the comment invaded the province of the jury and deprived him of a fair trial. The defendant here relies upon Dupree v. State, Okl.Cr., 514 P.2d 425 (1973), however, the reference to this case is apparently with respect to the uninvited and interrupting comment of the prosecutor during direct examination of the defendant wherein he asserted that the defendant was the same person who committed the alleged offense. Although the interrogatory here was clearly a leading question assuming the ultimate fact to be proved thereby, this was in no manner tantamount to the prejudicial nature of the comment made in positive terms in *Dupree*.

■ Apparently responding to the closing argument of the defense that the identification of the defendant by the State's witnesses had become tainted by the substantial passage of time, the prosecutor made the following argument:

"And why the delay? Ladies and gentlemen of the jury, there are certain things that the law in criminal cases prevent the State of Oklahoma from telling you unless counsel for the defense opens it up or by case law we are just prevented from telling you anything about it. Now, there are some questions that each of you have in mind, I bet you you do, because there are some things that I would love to tell you, I would like to have all of you raise your hand and we go down and have a press conference right here and I would lay it out to you but that is not evidence. The evidence is coming from that witness stand and that is what you are to base you opinion on. Now, the principal thing that I can't tell you under the law and the evidence

—

\* \* \* \* \* \*

[Objection overruled with exception]

\* \* \* \* \* \*

"You will have a question probably in your minds as to what directed the police to the defendant other than the observations of Mrs. Hunt and Mrs. Jack Baker on the day October 17, 1972. In other words, why did the State of Oklahoma wait until January the 3rd, 1973, to file its case. That's something that is not competent to testify to because of the situation we have. But it's not material. It's not material." (Tr. 237–238)

To the extent that the prosecutor indicated to the jury that they should take cognizance of matter not supported by the evidence, this argument is clearly improper. However, the prosecutor did not affirmatively assert prejudicial matter not supported by the evidence, but rather principally emphasized that the reason for the delay was not material to the issues before the jury. In view of the clear sufficiency of the evidence to support the guilt of the defendant, we are of the opinion that such comment was not sufficiently prejudicial to require reversal of this case.

■ In response to the closing argument of defense counsel that blood specimens and fingerprints taken from the scene of the crime where not identified with those of the defendant, the prosecutor stated to the jury that the laboratory report concluded that an insufficient quantity of blood had been submitted, and commented with expertise regarding the difficulty encountered in obtaining, classifying and identifying latent fingerprints. (Tr. 241) The defendant contends that such comment and argument was not supported by the evidence, and with this we agree. However, while such argument was clearly improper and should have excluded, we disagree that the defendant was prejudiced thereby since neither blood specimen comparison nor fingerprint identification formed any part of the proof offered by the State.

**444**

Finally, the defendant argues that error was committed when the prosecutor commented in argument on the defendant being in the commission of a burglary at the time of the subject offense. The defendant cites Thompson v. State, Okl.Cr., 462 P.2d 299 (1969), however, the argument in that case went beyond comment on the evidence and effectively defined other crimes for enhancement of punishment. Evidence of the burglary was properly admitted here, and the prosecutor was well within the realm of proper argument in commenting on the burglary as that crime related to the elements of the subject offense. This Court stated in Syllabus 1 to Battle v. State, Okl.Cr., 478 P.2d 1005 (1970):

> The right of argument contemplates a liberal freedom of speech, and the range of discussion, illustration and argumentation is wide. Counsel for both the State and the defendant have a right to discuss fully from their standpoints the evidence and the inferences and deductions arising therefrom. It is only when argument by counsel of the State is grossly improper and unwarranted upon some point which may have affected defendant's rights that a reversal can be based on improper argument."

We have carefully examined each of the properly preserved assignments of error under this second proposition, and the cases cited in support thereof. Although there are respects in which the conduct of the prosecutor cannot be condoned, we hold against this proposition as there is no error sufficiently prejudicial to require reversal.

In conclusion, we observe that the record is free of any error which would justify modification or reversal. The judgment and sentence is, accordingly, affirmed.

BRETT, P. J., and BLISS, J., concur.