Mark H. SCHNEIDER, Appellant,

v.

The STATE of Oklahoma, Appellee.

No. F–75–24.

Court of Criminal Appeals of Oklahoma.

July 15, 1975.

Ronald H. Mook, Tulsa, for appellant.

Larry Derryberry, Atty. Gen., Robert L. McDonald, Asst. Atty. Gen., Harold T. Garvin, Legal Intern, for appellee.

## OPINION

BUSSEY, Judge:

Appellant, Mark H. Schneider, hereinafter referred to as defendant, was charged and tried in the District Court, Pawnee County, Case No. CRF–71–30, for the offense of Attempted Rape. The jury found him guilty of the lesser included offense of Assault and Battery With Intent to Commit a Felony, in violation of 21 O.S.1971, § 681, and fixed his punishment at three (3) years' imprisonment and a fine of Five Hundred ($500.00) Dollars. From said judgment and sentence his appeal has been presented to this Court.

At the trial the first witness for the State was Woody C. Woods who testified that in April, 1971, he operated the Merchants Hotel in the city of Cleveland, Pawnee County, Oklahoma. He further testified that during the month or two prior to that time the defendant had been renting a room on the lower floor of the hotel, and that the witness' niece, Janice Napier, rented room 15 on the upper floor of the hotel on or about April 24, 1971. After being previously summoned to the hotel, he inspected room 15 the next day and discovered the bed to be in a disturbed condition and blood there as well as in the hallway.

Lylia Cates next testified that she lived in an apartment on the ground floor of the Merchants Hotel in April, 1971. Sometime after midnight on the night of the 24th or the morning of the 25th, she was awakened by the muffled screams of a female voice coming from directly above her apartment. She then awakened her husband, and telephoned the police. The screams continued for about five minutes until two police officers arrived, and they later brought a man down from the upper floor who was dressed in a white robe.

Melvin Cates then testified in substantial accordance with his wife, Lylia Cates. However, prior to the arrival of the police officers, he was several times able to discern a muffled voice screaming for help. When he heard the officers knock on the door of the apartment overhead, he heard the voice state "help me, he is trying to rape me." He also identified the defendant as the man the officers removed from the hotel, and described Janice Napier as being very upset when escorted from the hotel.

The alleged victim, Janice Louise Fisher (Napier), next testified that at about 12:00 p. m. on April 24, 1971, she went to the room she had rented a day earlier on the second floor of the Merchants Hotel. About 45 minutes later she went to bed clad only in panties. However, she had a girlfriend named Pam Haggard who lived in the next room, and left a lamp on as she expected her to visit after she got off

work at 2:00 a. m. as a cocktail waitress or cashier for the Hidden Valley Inn. Shortly thereafter she was awakened by a knock on the door and put on a knee length robe which buttoned in front. She inquired at the door for Pam but received no response. Thinking then that the party knocking might be a male friend of Pam named Phil Morgan, she inquired for Phil and a male voice replied affirmatively. She then opened the door slightly and observed the defendant, who was a stranger to her, wearing a white terry cloth robe tied around the waist. The defendant then forced the door open and threw her upon the bed where a struggle ensued for about 15 minutes before police officers knocked at the door and responded to her pleas for assistance. During the struggle she screamed repeatedly despite the defendant's admonishments not to do so, and thinking he was going to strangle her, she bit his hand when he placed it in her mouth to quiet her screams. She further related that as the defendant sat astride of her he kept telling her to open her robe, and when she asked him not to rape her he replied, "I am not, I just want to love your body." Also, the defendant repeatedly refused her pleas to leave and asked her if she wanted to die. The defendant did on one occasion agree to leave but then threw her back upon the bed. The defendant also removed her panties just before the arrival of the officers. Although she did observe his underwear beneath his robe, she further testified that the defendant did not remove his clothing nor touch her private parts.

The final witness-in-chief for the State was Cleat H. Hunt, who was at the time of the alleged offense an officer with the Cleveland Police Department. He testified that between 1:00 and 1:30 a. m. on April 25, 1971, he and Officer Dean Taylor were dispatched to the Merchants Hotel. Upon arrival he heard a female screaming from a room on the second floor. He and Officer Taylor then proceeded to the room, and when he knocked at the door a woman said, "Help me, please." He then opened the door himself and observed Janice Napier lying on a bed and the defendant on top of her with his head beside hers. The woman was wearing a robe with no undergarments, while the defendant was wearing a white robe with his underwear lowered to around his knees. The defendant was holding her down, and his private parts were covering hers in such a manner that he could possibly have been engaged in sexual intercourse. When the defendant released her, the witness observed that the defendant had an erection, and Janice Napier in a hysterical condition stated, "He was trying to rape me." The witness also observed that the bed was messed up with blood on it and Janice Napier. The defendant was intoxicated and his hand was bleeding somewhat profusely. The witness then advised the defendant to replace his underwear and arrested him. Pictures portraying the scene and depicting blood on the bed and the floor were then admitted into evidence as State's Exhibits numbered 7 through 16.

The defendant next took the stand in his defense and testified that after drinking beer all day at numerous taverns he returned very intoxicated to his room in the Merchants Hotel at about 12:15 a. m. on April 25, 1971. He then got undressed and about one half hour later went upstairs to room 15 wearing only his underwear and bathrobe. The defendant explained that earlier the same evening he had met a girl named Pat or Pam at the Rock Lounge in Cleveland, Oklahoma, and when she told him that she lived in room 15 he made rather indefinite arrangements to meet her later. Although he had not previously met this girl, the defendant admitted that he expected to have sexual intercourse with her. The defendant further stated that he had not seen this girl since that time nor made any effort to locate her, and was unable to describe her. When he knocked at the door to room 15 he heard someone ask in a whisper, "Is that you?" to which he replied affirmatively. When the door was opened the defendant entered the room and

closed the door. Once inside he first noticed that the girl who had answered the door was Janice Napier with whom he was not previously acquainted instead of the girl he described as Pat or Pam. She then started screaming and caused the defendant to become scared. In an attempt to settle her down, he then grabbed her and she grabbed him causing them both to tumble to the bed. He asked her to not scream and placed his hand over her mouth to prevent her from awakening others, but she bit his fingers causing them to bleed. He described her as very hysterical and when she said, "Don't rape me" and "I don't want to die," he replied, "You're not going to die, just shut up," and otherwise denied the incriminating statements attributed to him by the testimony of Janice Napier. Although her robe was open exposing her breasts, he denied removing any part of her clothing or his own, and did not touch her private parts nor become sexually aroused. He further testified that he had no intention of raping her and made no effort to do so. After struggling with her then for just a few minutes, he told her he would leave if she would be quiet. When she quit screaming he got off the bed to leave and was examining his hand when he heard a knock at the door. After opening the door to the officers himself, he walked from the room dressed just as he had entered. He overheard the complaining witness tell the officers something, but he had proceeded down the hallway a short distance before being arrested. The defendant also admitted having received a conviction for breaking and entering in 1960 or 1961.

M. E. Wade, an investigator employed by the defendant's trial attorney, next testified as the final defense witness that he had endeavored to locate Pam Haggard, but had only been able to ascertain from a local relative that she was last known to have lived in Dallas, Texas.

Officer Dean Taylor, of the Cleveland Police Department, then testified for the State in rebuttal. His testimony was in substantial accordance with that of Officer Hunt, except that when Officer Hunt entered the room he was momentarily between Officer Taylor and the defendant, and when Officer Taylor first observed the defendant he was standing and partially bent over facing the complaining witness. Also, no testimony was solicited from this witness regarding the state of the defendant's sexual arousement, and he could not recall if the defendant's hand was bleeding.

The State then rested rebuttal and no evidence was offered in behalf of the defendant in surrebuttal.

In the first of his six assignments of error, the defendant contends he was denied his right to a speedy trial under the Sixth Amendment to the United States Constitution and Article II, § 20, of the Oklahoma Constitution.

In an expanded discussion, this Court recently dealt with the right to speedy trial in *Bauhaus v. State,* Okl.Cr., 532 P.2d 434 (1975). We there applied the functional analysis approach set forth in *Barker v. Wingo,* 407 U.S. 514, 92 S.Ct. 2182, 33 L. Ed.2d 101 (1972), and quoted in part therefrom at page 530 and 533, 407 U.S., at page 2191, 2192, 2193, of 92 S.Ct. as follows:

". . . The approach we accept is a balancing test, in which the conduct of both the prosecution and the defendant are weighed.

"A balancing test necessarily compels courts to approach speedy trial cases on an ad hoc basis. We can do little more than identify some of the factors . . . Length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant.

\* \* \* \* \* \*

"We regard none of the four factors identified above as either a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial. Rather, they are related factors and must be considered together with such

other circumstances as may be relevant. In sum, these factors have no talismanic qualities; courts must still engage in a difficult and sensitive balancing process. . . ." (Footnotes omitted)

Considering the length of delay and the reason therefor together, we observe that the defendant was arrested April 25, 1971, but not brought to trial until December 4, 1972, a delay of approximately 19 months. Although the defendant was represented by a retained attorney at his initial appearance on the day following his arrest, this attorney then withdrew with leave of the court after an attorney was appointed at defendant's request on May 5, 1971. The appointed attorney then represented the defendant through the first preliminary hearing and arraignment, but then withdrew with leave of the court on July 26, 1971. At that arraignment the court granted defendant's request that trial be delayed until the fall jury session. When the case was called for pretrial later that fall, jury trial was set for December 6, 1971, but since the defendant appeared for pretrial without an attorney he was to reappear before the court on November 28, if he had not retained an attorney by that time. However, when the defendant again appeared without counsel on November 29, that trial date was stricken and the defendant was then to appear before the court on January 24, 1972, for the purpose of rescheduling the trial and informing the court as to who was his attorney. On that date the defendant's ultimate trial attorney entered the case, and the appearance docket reflects that trial was to be set for the next jury session. Trial was then set for March 27, but was continued to the next jury session upon motion of the defendant. Without any explanation the appearance docket then reflects that on June 22, trial was again passed to the fall jury session. When again called for pretrial on November 14, on motion of the defendant, a second preliminary hearing was ordered for November 27, because a record was not made at the former preliminary examina-tion and on November 20, the ultimate trial date was scheduled. After being bound over for trial at the second preliminary hearing, the defendant was again arraigned on December 4, and proceeded to trial. The inference that defendant's difficulties with counsel were at least in some part attributable to himself is further supported by the fact that his trial attorney later withdrew, and a fourth attorney then initiated appeal of this case before later being completed by the defendant's present attorney.

Therefore, the record before this Court indicates that the delay here was principally due to difficulties encountered by the defendant in obtaining an attorney satisfactory to him, and perhaps some dilatory tactics practiced by himself. At least until June 22, 1972, and for the first 14 months of this 19 month period, any delay was occasioned by the defendant. The record affirmatively reveals that at least the first three of the total of four distinct delays or continuances were either at the request of the defendant or for reasons attributable to him. While emphasizing that the primary burden was upon the courts and the prosecuting authorities to bring an accused to a speedy trial, the United States Supreme Court in *Barker v. Wingo, supra,* further emphasized that this right may be affirmatively waived, in stating that:

" . . . We hardly need add that if delay is attributable to the defendant, then his waiver may be given effect under standard waiver doctrine, . . . " page 529, 407 U.S., page 2191, 92 S.Ct.

The defendant here readily admits that he did not move for an earlier trial, nor did he even assert deprivation of the right until after trial. The weight and significance to be attached to the defendant's assertion of his right was clearly indicated in *Barker v. Wingo, supra,* as follows:

" . . . Whether and how a defendant asserts his right is closely related to the other factors we have mentioned. The strength of his efforts will be af-

fected by the length of the delay, to some extent by the reason for delay, and most particularly by the personal prejudice, which is not always readily identifiable, that he experiences. The more serious the deprivation, the more likely a defendant is to complain. The defendant's assertion of his speedy trial right, then, is entitled to strong evidentiary weight in determining whether the defendant is being deprived of the right. We emphasize that failure to assert the right will make it difficult for a defendant to prove that he was denied a speedy trial." page 531 and 532, 407 U.S., page 2192, 92 S.Ct.

■ The fourth factor was analyzed in *Barker v. Wingo, supra,* as follows at page 532, 407 U.S., at page 2193, 92 S.Ct.:

" . . . Prejudice, of course, should be assessed in light of the interests of defendants which the speedy trial right was designed to protect. This Court has identified three such interests: (i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired. Of these, the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system. . . . " (Footnote omitted)

The defendant fails to identify any specific prejudice resulting from the delay. However, an affirmative demonstration of prejudice is not a prerequisite to a claim of denial of the right to speedy trial, and as noted above prejudice is not limited to detriment to the defense of the accused. *Moore v. Arizona,* 414 U.S. 25, 94 S.Ct. 188, 38 L.Ed.2d 183 (1973).

Except for the first three weeks following arrest, the defendant was at liberty on bond during the entire period prior to trial. We recognize that delay, however, "may seriously interfere with the defendant's liberty, whether he is free on bail or not, and that may disrupt his employment, drain his financial resources, curtail his associations, subject him to public obloquy, and create anxiety in him, his family and his friends." *United States v. Marion,* 404 U.S. 307, 320, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971). Any such resulting prejudice here, however, would certainly seem to be nominal especially since the record indicates that the defendant did not want a speedy trial. Further, the defense was not here impaired by State caused delay, and whether the defendant could have even offered additional proof is speculative. The only additional material testimony that might have possibly advanced the merits of the defense was that of the girl the defendant identified as Pat or Pam, who may have possibly been the girlfriend of the complaining witness named Pam Haggard. However, even assuming that the final continuance was granted in behalf of the State, there is no indication that this witness would have been available at that time. Also, whether such testimony would have been as represented by the defendant is questionable, especially since the delay was not utilized to locate the witness. The defendant never did attempt to locate her, and not until the second preliminary hearing one week before trial did the defendant's attorney undertake to locate Pam Haggard. The attorney explained that he did not know of the identity of Pam Haggard until the second preliminary examination, however, we note that a continuance to allow time to locate her was not sought.

■ At least the vast portion of the delay here was attributable to the defendant. Any prejudice occasioned by delay caused by the State was certainly nominal, and the defendant not only failed to assert his right but affirmatively waived the same for all but the last five months of this period. We therefore hold that the defendant was not denied his right to a speedy trial and that this proposition is wholly without merit. Other cases relied upon by defendant in support of this proposition are either readily distinguishable or not in point.

The defendant next contends that his right to remain silent under the Fifth Amendment to the United States Constitution was infringed, and that fundamental error resulted when he was cross-examined as follows:

"Q. Have you ever, Mr. Schneider, since this incident happened, told your story—the story you told today—to any law enforcement officer?

"[DEFENSE ATTORNEY]: If the Court please, we want to object to that. No law enforcement officer has ever asked him, that I know of.

"THE COURT: That will be sustained.

"Q. You're innocent, aren't you, Mr. Schneider?

"A. Yes, sir.

"Q. You have been facing this charge about a year-and-a-half, haven't you?

"A. Yes, sir.

"Q. Have you ever come forward and conferred with me concerning this matter?

"[DEFENSE ATTORNEY]: Object to that, if Your Honor please.

"THE COURT: That will be sustained." (Tr. 196)

■ Under the majority decision of this Court in *Buchanan v. State,* Okl.Cr., 523 P.2d 1134 (1974), and the authority there collected, such cross-examination on the defendant's pretrial silence was clearly improper. We there held at page 1137 that:

"It is the opinion of this Court that the cross-examination of the witness concerning her failure . . . to come forward and make a statement prior to trial and the closing argument stressing same constitutes fundamental error on behalf of the prosecuting attorney. The defendant had a clear constitutional right to remain silent from the moment she became a suspect. The prosecuting attorney's comment upon the defendant's failure to make a statement or to raise her defense of an alibi prior to trial con-

stitutes a clear, fundamental, and reversible error on the State's part. . . ." (Citations omitted)

That case is, however readily distinguishable from the case at bar. In *Buchanan* the prosecutor was permitted to cross-examine the defendant on her pretrial silence and thereafter commented thereon in closing argument. Here, the defendant's objections were sustained and the questions were not even answered. If the defendant had considered the questions alone prejudicial, he could have requested that the jury be admonished to disregard them or moved for a mistrial. In *Chapman v. State of California,* 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), however, the United States Supreme Court held that:

". . . before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt. . . ."

In view of the clear sufficiency of the evidence to support the verdict of guilt, we are of the opinion that under the facts and circumstances of this case the questions in and of themselves were not fundamentally prejudicial, and hold the error to be harmless beyond a reasonable doubt. Also, in assessing less than the maximum sentence on a lesser included offense the jury did not demonstrate prejudice in the assessment of punishment. See, *Burroughs v. State,* Okl.Cr., 528 P.2d 714 (1974), where even the improper introduction of testimony by the State that during interrogation the defendant chose to exercise his right to remain silent was cured by trial court admonishment in view of the overwhelming evidence of guilt.

■ In the third assignment of error, the contention is made that fatal error resulted when the prosecutor cross-examined the defendant regarding his failure to attempt to locate and call as witnesses the girl he referred to as Pat or Pam, as well as others with whom the defendant pur-

portedly came in contact while drinking at various locations prior to the alleged subject offense. Without intimating that this proposition presents merit, we find this assignment of error to be improperly before this Court for the reason that the only objection interposed to such examination was sustained and not answered by the defendant. (Tr. 164–165) As set forth in paragraph three of the Syllabus to *Love v. State*, Okl.Cr., 360 P.2d 954 (1961), we need here only observe that we have repeatedly held as follows:

"It is the duty of counsel to raise at the proper time all objections to the proceedings . . . and when this is not done, they will be treated as waived unless they are of such a nature as to deny defendant a fair and impartial trial."

The fourth assignment urges that the trial court erred in permitting the testimony of Officer Dean Taylor as rebuttal proof. Any error in this regard was properly preserved for review. As recognized by the defendant, rebuttal testimony may be offered to explain, repel, counteract, disprove, or destroy facts given in evidence by an adverse party, as well as to clarify a disputed point, notwithstanding that the same testimony might have been introduced in chief, and that the introduction of such evidence is a matter of discretion for the trial court which will not be a ground for reversal absent an abuse thereof. *Pulliam v. State*, 61 Okl.Cr. 18, 65 P.2d 426 (1937) and *Henderson v. State*, Okl.Cr., 389 P.2d 363 (1964). However, he argues that through the testimony of Officer Taylor the State simply rehashed the testimony of Officer Cleat H. Hunt, previously presented in chief, and that the ruling of the trial court permitting such testimony was so flagrant as to deny the defendant due process of law. We disagree.

In support of this proposition the defendant cites *Doser v. State*, 88 Okl.Cr. 299, 203 P.2d 451 (1949), *Pierce v. State*, Okl.Cr., 371 P.2d 924 (1962), and *Riddle v. State*, Okl.Cr., 373 P.2d 832 (1962). How-

ever, each of those cases is readily distinguishable because in the first two the same witness who testified in chief also repeated the same testimony in rebuttal, while in the latter case the State called in rebuttal a witness who was effectively a character witness for another witness who had previously testified in chief for the State. Although the testimony of Officer Taylor could have been introduced in chief and was somewhat cumulative, his testimony was corroborative of that of Officer Hunt, and directly refuted the testimony of the defendant that he had opened the door to the officers with his private parts clothed. We are therefore of the opinion that the ruling of the trial court upon the admissibility of this evidence was not an abuse of discretion. In *Dickerson v. State,* Okl.Cr., 422 P.2d 213, 215 (1966), we recognized that:

" . . . in nearly every case, we find evidence introduced as rebuttal which might properly have been introduced in support of the case in chief, but this is not the sole test. The question which arises and is directed to the discretion of the trial court is whether the evidence offered in rebuttal is a re-hash of the State's case in chief, or whether it pertains to some material issue which has become important because of effect of evidence introduced on behalf of defendant. See, *Bowman v. State*, 82 Okl.Cr. 199, 167 P.2d 663; and *Hall v. State*, Okl.Cr., 309 P.2d 300."

Further, in paragraph two of the Syllabus to that opinion we stated as follows:

"When the state makes out a clear case in chief, the fact that certain testimony was reserved for rebuttal, which would have been admissible in establishing the case in chief, but which is clearly in rebuttal of a material defense, or testimony introduced in defense, does not render the same inadmissible."

In his fifth assignment of error, the defendant argues that fatal error resulted when the jury observed certain exhibits which the trial court subsequently ruled to

be inadmissible upon the apparent basis that the State had failed to establish a sufficient chain of evidence. The complained of exhibits were as follows: (1) a box in which exhibits 2 through 5 were stored; (2) defendant's robe; (3) the bedsheet removed from the scene of the alleged offense; (4) the victim's robe; (5) a bedspread also removed from the victim's room; (6) a man's watch found on the floor of the victim's room. These exhibits were viewed by the jury when identified by Officer Cleat H. Hunt during examination by the State, and when offered into evidence the trial court sustained defendant's objection thereto but overruled his Motion for Mistrial. Although the defendant asserts that the prosecutor attempted to introduce these items knowing that he could not establish a sufficient chain of evidence and solely to prejudice the jury against the defendant, we need only observe that the record does not support this contention.

■ Without passing upon the correctness of the trial court's ruling in refusing admission of these exhibits, we are of the opinion that this proposition too is without merit. We first fail to see how the mere observation of these items by the jury could possibly have prejudiced the defendant. The uncontroverted proof established that any blood stains on the robes and bed linens resulted from the injury inflicted upon the defendant by the victim, and these exhibits were only corroborative of other uncontroverted testimony and not of an inherently prejudicial nature. Also, exhibits 3 through 6 were depicted among the photographs marked as exhibits 7 through 16, and the defendant expressly waived any objection to the admission of the latter exhibits. (Tr. 130–131) Even the admission of evidence which is merely cumulative is not reversible error though the evidence be inadmissible. See, *Constabile v. State*, Okl.Cr., 513 P.2d 588 (1973). Additionally, however, the defendant failed to request that the jury be admonished not to consider these items as evidence. Un-

less the error complained of is fundamentally prejudicial, the defendant must not only timely object but also move that the objectionable matter be stricken from the jury's consideration or he is deemed to have waived the same. See, *Gaddis v. State*, Okl.Cr., 447 P.2d 42 (1968) and *Ruhm v. State*, Okl.Cr., 496 P.2d 809 (1972).

■ In the final assignment of error the defendant contends that in defining an attempt to commit a crime the trial court failed to fully and satisfactorily instruct the jury regarding the requisite intent. Although he objected to the instruction, the defendant failed to submit a written instruction, and now cites no authority in support of this proposition. In holding this assignment to be without merit, we therefore need only observe that the instructions considered as a whole fairly and fully state the law applicable to the case. In *Bryant v. State*, Okl.Cr., 521 P.2d 402, 405 (1974), we again held that:

". . . if the defendant is not satisfied with the instructions given by the court, and desires additional or other instructions, it is his duty to prepare the desired instructions in writing and submit them to the court. If he fails to do so, a conviction will not be reversed unless the Court is of the opinion, in light of the entire record and instructions of the court, that there was a failure to instruct upon some material question of law, and that defendant has been deprived of a substantial right. . . ."

Also, in *Sandefur v. State*, Okl.Cr., 461 P.2d 954, 956 (1969) we recognized that this Court has repeatedly held as follows:

" 'It is necessary for counsel for plaintiff in error not only to assert error, but to support his contentions by both argument and the citations of authorities. Where this is not done, and it is apparent that the defendant has been deprived of no fundamental rights, this court will not search the books for authorities to support the mere assertion that the trial

court has erred.' See: *Collins v. State,* Okl.Cr., 407 P.2d 609."

In conclusion, we observe that the record is free of any error which would justify modification or reversal. The judgment and sentence is, accordingly, *affirmed.*

BRETT, P. J., and BLISS, J., concur.