Grayson Lee **WHITE**, Appellant,

v.

The **STATE** of Oklahoma, Appellee.

No. F–76–76.

Court of Criminal Appeals of Oklahoma.

July 22, 1976.

Ainslie Perrault, Jr., Tulsa, for appellant.

Larry Derryberry, Atty. Gen., Robert L. McDonald, Asst. Atty. Gen., Annis Kernan, Legal Intern, for appellee.

## OPINION

BUSSEY, Judge:

Appellant, Grayson Lee White, hereinafter referred to as defendant, was charged, tried and convicted in the Tulsa County District Court, Case No. CRF–74–2991, for the offense of Shooting with Intent to Kill, in violation of 21 O.S.1971, § 652. His punishment was fixed at four (4) years' imprisonment, and from said judgment and sentence a timely appeal has been perfected to this Court.

At the trial, Don Clem testified that on the 20th day of December, 1974, he was at the defendant's home in Tulsa, along with his two brothers and the defendant's wife, Susan. Everybody except Susan injected reds or seconals. He left at approximately 10:00 p. m. in defendant's Volkswagen. He returned to defendant's home at approximately midnight. Defendant ran up the hood of the car and kicked the windshield, shattering it. Defendant stated, "You and your brothers are all screwing me around." [Tr. 92] A fight ensued and Clem knocked the defendant unconscious. He decided to walk home some ten blocks away and as he reached the corner, defendant's wife ran up to him. She asked him to return and attempt to calm the de-

fendant. While talking to Susan he turned, observed the defendant and a blast from a gun. He fell to the ground bleeding, and Susan ran away to call for help. Defendant drug him into his house. Defendant asked him to report that the shooting had been an accident, and that Susan was shooting at him, missed and hit Clem. Clem admitted a previous conviction for Possession of Marijuana and admitted selling marijuana in the past. He further admitted taking drugs that evening, but knew what he was doing.

On cross-examination he testified that he had never argued or fought with defendant before and that they had worked together as friends in the construction business. He testified that the only reason he could imagine why defendant would want to shoot him was that defendant had asked him to go driving earlier in the evening and he declined.

Officer Fred Morrow testified that on December 21, 1974, he received a call concerning a shooting in progress at 2008 Atlanta Place, at approximately 12:54 a. m. Upon arriving, his partner went to the front door of the residence and he proceeded to the northeast corner where he peered through an open window. He observed the defendant start through the front door as Officer Compost knocked, but when he identified himself as a police officer, defendant turned and went to the back portion of the house. He heard what he thought was a toilet bowl flushing. Morrow returned to the front porch and joined Officer Compost. Defendant opened the front door and he observed Clem lying on his back, just inside the door. The defendant informed him that he would have to have a search warrant to enter the house. He advised defendant: "We were there on a felony situation and we went on in his house." [Tr. 146] He asked Clem what had happened and Clem did not reply. He advised the defendant of his *Miranda* rights and asked him what happened. The defendant stated that his wife had fired the shot and that she left

the scene taking the gun with her. Defendant appeared to be "a little glassy-eyed and a little bit high." He subsequently went into the bathroom and found narcotic paraphernalia in the toilet bowl. The Assistant District Attorney and defense attorney thereupon entered into two stipulations whereby it was agreed that if a Dr. Bellings were called, he would testify that he treated Clem for a gunshot wound; that the bullet lodged in his spine and could not be removed, thus leaving him permanently paralyzed from the upper chest to the lower extremeties. Further, that two pages from the physician's desk reference book were stipulated to properly define the effects of seconol sodium.

Officer Tom Surber testified that he arrived at the scene as the victim was being removed by the ambulance drivers; that he had a conversation with the defendant and the defendant appeared to be "high, but not overly high." [Tr. 177]

For the defense, Leonard Skeehn, Jr., testified that on the evening of December 20, 1974, defendant and Larry Clem came to his house before midnight. Defendant appeared to be intoxicated to the point of almost passing out. Larry Clem showed him the seconol tablets and offered to sell them to him. Defendant injected three of the tablets in his presence.

Susan White, defendant's wife, testified that they met the Clem brothers approximately a year earlier; that the Clems brought drugs to their house and either sold or gave the drugs to her husband; that prior to moving to Tulsa, defendant did not use hard drugs. On the evening in question Larry Clem brought downers to their home and tried to sell them to defendant. When defendant declined to purchase them "they started shooting them up." [Tr. 208] At approximately 10:00 p. m., Larry Clem and defendant left to sell Clem's drugs. Don and Alvin Clem left to get a different type of downer; that some time after midnight defendant returned to the house, kicked in the front door and started tearing up the house. He accused

Susan of having an affair with Don Clem and said people had been ripping him off. He continued to rant and rave and tore the phone from the wall. He next decided that he wanted to call the Clems and asked Susan to take him to a phone. As they started to get into their car, Don Clem drove up behind them. Defendant ran back to his car and kicked in the windshield. A fight ensued and ended with defendant lying on the ground. Clem started walking off and she ran after him, stopping him under the streetlight. As she was talking to Clem she saw the flash of a gun and Clem fell to the ground. She ran to her car and drove away. She subsequently returned to the house and found a derringer between the cushions of their sofa.

Defendant testified that on the 20th day of December, 1974, he and Don Clem had been together since 10:30 or 11:00 that morning; that evening Don left to pick up his brother and they returned with the downers; that he believed that he injected six of the capsules; that he experienced a reaction that caused his head to throb. He recalled leaving in his car with Larry Clem, but did not know where they went until he was later informed of the location. He remembered returning home, but did not recall tearing up the house. Defendant also remembered being in his car attempting to leave when Don Clem drove up into the driveway. He kicked the windshield and a fight ensued. The next thing he remembered was dragging Clem across the yard and into the house. Clem asked him to contact his brother, Larry. The police knocked at the door, whereupon Clem gave him a baggie and syringe and told him to flush them down the commode. He went to the commode and then answered the door. He told the police that his wife was involved in the shooting because he was scared. He testified that Clem was shot because "I guess it was the fear I had in me from the drug and the alcohol we consumed." [Tr. 239]

In rebuttal, Officer Morrow testified that he looked through the window of defendant's home to make sure defendant did not have a weapon and did not see defendant take anything from Clem before he proceeded to the bathroom.

■ The first assignment of error asserts that the trial court erred in its statement to the jury on voir dire in that the court gave what constituted an "Allen Instruction." The record reflects that during voir dire, the trial court stated:

"Now, is there anything about the questions that I have asked the jurors that gives or brings to mind or that there is any idea in your mind or anything you would like to volunteer as to whether or not you would be a fair and impartial juror. The State of Oklahoma and the defendant is [sic] entitled to a fair trial and I know, of course, that jurors are not required to agree. I think the last three verdicts, or the last three juries have been hung juries and that is, of course, if there is anything about your service that you feel that you should not hear the evidence and go back with your fellow jurors and deliberate and rationalize and hear and each maintain your own independent judgment, but, of course, examined the rationale of your brother or sister jurors. You all four, you can do that? Is there anyone that doubts whether he can or not? And as we start this case, do none of you lean against the State or against defendant?" [Tr. 15–16]

We are of the opinion that the trial court's remarks were not improper. The rationale behind those jurisdictions which have condemned the "Allen Instruction," is that a trial judge should not coerce a jury to the extent of demanding that they return a verdict. In the instant case the remarks were made during voir dire examination wherein the trial court was attempting to ascertain if the jurors would be open-minded by considering the rationale of their fellow jurors while maintaining their

own independent judgment. We, therefore, find this assignment to be without merit.

■ The second assignment of error contends that the trial court erred in allowing the District Attorney to define reasonable doubt by "what it was not" during voir dire examination of the jury. The record reflects that the District Attorney stated as follows:

"MR. WILLIAMS: Does everybody understand what we mean by reasonable doubt? The burden is on the State to prove to you all beyond a reasonable doubt that defendant committed the crime alleged. Do you understand that the State does not have to prove to you beyond a shadow of a doubt—

"MR. MOOK: Objection. The law is clear that neither the prosecutor nor I can define reasonable doubt.

"MR. WILLIAMS: I am not trying to define reasonable doubt.

"THE COURT: I will permit him to make that statement and I will overrule your objection." [Tr. 20]

In *Wald v. State,* Okl.Cr., 513 P.2d 330, wherein the Assistant District Attorney posed a similar question during voir dire, we stated:

". . . Although there is an inherent danger in pursuing a line of questioning during voir dire examination which inquires into the realm of a legal question, asking a juror whether he understands the burden of proof in the particular case and asking a jury or juror whether he would hold the State to a greater burden of proof than is required by law is a fair and legitimate question. Counsel argues in his brief the prosecutor made an attempt to define reasonable doubt to the jury. It goes without saying that defining reasonable doubt under case authority from this jurisdiction is error. It is this Court's opinion, however, after studying voir dire in its entirety, that no attempt was made by the prosecutor to define the term of reasonable doubt.

Any possible misconception and an asserted error resulting therefrom, was clearly cured by the court's admonition given to the jury in the beginning phase of voir dire examination admonishing the jury the only law they were to consider is that delivered in the court's instructions. *Hensley v. State,* Okl.Cr., 493 P.2d 849 (1972). There being no prejudice shown, we find this proposition to be without merit."

The jury in the instant case, as in *Wald,* supra, was instructed that the only law they were to consider was that contained in the court's instructions. We therefore find this assignment to be without merit.

■ The third assignment of error asserts that the trial court erred in allowing improper rebuttal testimony of Officer Fred Morrow. Defendant argues that Morrow's testimony in rebuttal was substantially identical to his testimony on direct examination. We disagree. The defendant testified that Clem handed him a baggie containing narcotics and a syringe and asked him to dispose of it before he let the police officer into the residence. Officer Morrow testified, in rebuttal, that the defendant did not approach Clem, but instead went directly into the bathroom. In *Schneider v. State,* Okl.Cr., 538 P.2d 1088, we stated:

". . . [R]ebuttal testimony may be offered to explain, repel, counteract, disprove, or destroy facts given in evidence by an adverse party, as well as to clarify a disputed point, notwithstanding that the same testimony might have been introduced in chief, and that the introduction of such evidence is a matter of discretion for the trial court which will not be a ground for reversal absent an abuse thereof. *Pulliam v. State,* 61 Okl.Cr. 18, 65 P.2d 426 (1937) and *Henderson v. State,* Okl.Cr., 389 P.2d 363 (1964). . . ."

■ The fourth assignment of error asserts that the trial court erred in allowing cross examination of defendant with re-

spect to the purchase, possession and sale of narcotics. We need only observe that the entire trial transcript is replete with references to drug use of defendant and Clem. Clem testified, without objection, that defendant on occasion used barbiturates, PCT, uppers, and heroin. Defendant's wife testified on direct examination that the Clem brothers brought drugs to their residence and either sold or gave them to the defendant. She further testified on direct examination that defendant went with Larry Clem to see if Clem could sell his drugs on the evening in question.

In *Harvell v. State*, Okl.Cr., 395 P.2d 331 (1964), we stated:

". . . It is not error alone that reverses judgments of conviction of crime in this State, but error plus injury, and the burden is upon the defendant to establish to this Court that he was prejudiced in his substantial rights by the commission of error."

In view of the foregoing testimony we cannot find that defendant was, in fact, prejudiced by the cross-examination.

The fifth assignment of error contends that the trial court erred in denying defendant's requested instructions on intent and circumstantial evidence. We have carefully examined defendant's requested instructions and the instructions given by the trial court. We observe that the defendant's requested instructions were substantially covered by those given by the trial court. See, *Parrott v. State*, Okl.Cr., 522 P.2d 628; *Haywood v. State*, Okl.Cr., 513 P.2d 322; and *Kerr v. State*, Okl.Cr., 276 P.2d 284.

■ The sixth assignment of error contends that the trial court erred in denying defendant's motion for mistrial on the grounds that a juror took notes into the jury room. The record reflects that after the jury returned its verdict, the following transpired:

"MR. MOOK: Your Honor, I wish to —one of them took notes during the course of this trial and took the notes into the jury room with them.

"THE COURT: Mrs. Crawford, it has been brought to the attention of the court that you were scribbling some notes and I was wondering if you used the notes when you were back in the jury room?

"JUROR CRAWFORD: No, sir.

"THE COURT: You did not?

"JUROR CRAWFORD: No.

"MR. MOOK: Your Honor, in spite of the verdict rendered in court, I move for a mistrial on this case based upon the fact that the juror did take notes and did take them into the deliberation room. *Glazier v. State*, found in 514 P.2d 87, a 1973 case is right on point.

"THE COURT: I think if the juror had relied upon the notes after—but can the juror state to the court that you did not review the notes of Mrs. Crawford?

"THE FOREMAN: Unequivocably, sir. She brought no notes in or advised us of any notes. In fact, others may know about her writing, but did anybody know of any notes she took.

"MR. MOOK: Mr. Kizer?

"JUROR KIZER: I was sitting next to Mrs. Bradshaw, and she had no notes in her presence.

"MR. MOOK: I believe the case states as a rule of law that no notes shall be taken by the jurors in the court of the trial and I do make a motion to set aside the verdict and declare a mistrial, based upon the case cited.

"THE COURT: I will take this up at the time of filing of motions and formal sentencing. The record shows that the notes are in the custody of the court. You will give them to the court reporter and they will be made available to you. Are you satisfied with the statement of the other jurors, so that there would not be any need for them to be called back from their work?

"MR. MOOK: I don't think there is any reason to do that, but I do want to make a record. I call this to your attention prior to returning to open court and made a motion for mistrial at that time.

"MR. WILLIAMS: If we are going to make a record at the time he asked for a mistrial I want it to be known that this was not brought to our attention until the jury came back with the verdict. And that this is—

"MR. MOOK: That is not true, I deny that unequivocally.

"THE COURT: We won't go into that part of it, but that matter has been settled. Then the jury unanimously stated that the notes were not used in the jury deliberation room by concensus of the jury into the record. . . ." [Tr. 308–310]

We concur with the trial court's ruling on defendant's motion for mistrial. We first observe that the defendant did not include the notes in his designation of record, thus making the same unavailable for this court's examination. This Court will not speculate as to the contents of the juror's notes. The record is abundantly clear that the notes were not used in the jury's deliberations.

▌ The final assignment of error asserts that the Assistant District Attorney misstated the law in his closing argument concerning the defense of intoxication. The record reflects the prosecutor stated:

"MR. WILLIAMS: They can use their common sense, Your Honor. Ladies and Gentlemen, because a guy gets drunk and goes into a liquor store and goes into a store and robs it, because he is drunk, is no defense." [Tr. 302]

We are of the opinion that the Assistant District Attorney's remarks were not improper, but rather an attempt to call the jury's attention to Instruction No. 6, which correctly states the invalidity of voluntary intoxication as a defense should defendant still be able to form the requisite criminal intent. We have repeatedly held that the right of argument contemplates a liberal freedom of speech, and the range of discussion, illustration and argumentation is wide. Counsel for both the State and the defendant have a right to discuss fully from their standpoints the evidence and the inferences and deductions arising therefrom. It is only when argument by counsel for the State is grossly improper and unwarranted upon some point which may have affected defendant's rights that a reversal can be based on improper argument. See, *Harris v. State*, Okl.Cr., 523 P.2d 1140 (1974).

In conclusion, we observe that the record is free of any error which would cause reversal or justify modification. The judgment and sentence is accordingly *AFFIRMED*.

BRETT, P. J., and BLISS, J., concur.