2003 OK CR 18

**Antonio Garcia ELLIS, Appellant,**

v.

**The STATE of Oklahoma, Appellee.**

**No. F–2001–924.**

Court of Criminal Appeals of Oklahoma.

Sept. 5, 2003.

As Corrected Sept. 10 and Oct. 24, 2003.

Mickey Homsey, Terry McMillian, Oklahoma City, OK, counsel for appellant at trial.

Shannon Henson, Joellyn McCormick, Assistant District Attorneys, Oklahoma County District Attorney's Office, Oklahoma City, OK, counsel for the State at trial.

Michael D. Morehead, Okla. Indigent Defense System, Norman, OK, counsel for appellant on appeal.

W.A. Drew Edmondson, Attorney General of Oklahoma, William R.Holmes, Assistant Attorney General, Oklahoma City, OK, counsel for the State on appeal.

### *OPINION*

LUMPKIN, Judge.

¶ 1 Appellant, Antonio Garcia Ellis, was tried by jury in the District Court of Oklahoma County, Case Number CF–1999–218 and convicted of First Degree (Felony) Murder, in violation of 21 O.S.Supp.1998, § 701.7(B). The jury set punishment at life imprisonment without the possibility of parole, and the trial judge sentenced Appellant

in accordance with the jury's determination. Appellant now appeals his convictions and sentences.

¶2 On January 6, 1999, at approximately 10:40 p.m., Christopher David Terry was washing and vacuuming his white Ford Explorer at the Vend–A–Car Wash in Oklahoma County, when he received a fatal gunshot wound to his chest. Terry was a teacher at Grace Christian Academy, and his murder received a great amount of media attention.

¶3 The bulk of the State's case against Appellant, a Putnam City High School student, centered upon the eyewitness testimony of Michael Lang.[1] At 10:41 p.m. on the night in question, Lang called 911, identified himself, and told the Warr Acres operator he had heard a gunshot. Lang said, "I've got someone on the ground over here...." Police arrived within a minute and found Terry lying outside his vehicle, bleeding profusely. Lang was still near the pay phone from which he had called.

¶4 Lang testified he was walking north on Ann Arbor Street that night when he saw Appellant. Lang knew who Appellant was because Lang knew Appellant's brother. Appellant reportedly approached Lang, who was smoking a cigar, and asked if he could have one. Lang did not have another cigar, so he allowed Appellant to drag his. As they approached 50th Street, Appellant brought Lang's attention to a white Ford Explorer and said he was going to "get that nigger." Terry had been vacuuming the Explorer.

¶5 According to Lang, Appellant approached Terry, pointed a gun at him, repeatedly yelled "give me the keys," and then shot Terry. Lang saw Terry try to block himself from the bullet by putting his arm up. Lang did not see Terry act aggressively and never heard him say a word. As Terry fell to the ground, Lang claimed Appellant briefly searched his body and then ran from the scene.

¶6 Lang testified he and Appellant were the only ones around when Terry was shot; he saw no one leave by a car.

¶7 Lang originally told police he had heard a gunshot and simply wandered upon the scene. He said nothing about knowing the shooter. His story began to change over time. At some point, he admitted seeing the shooting, but he told police his eyesight is bad and he did not know if the shooter was black or white. After flunking a polygraph exam, Lang admitted he knew more than he had originally reported, and he implicated Appellant as the murderer.

¶8 Lang testified at trial that he had lied originally because he didn't want to get involved and didn't want anything to happen to him or his family. Appellant lived quite close to Lang, and, according to Lang, Appellant always wore blue clothing, which is the color worn by Crips gang members. Lang had assumed Appellant was in a gang, and he believed he might get shot if he told the truth. Lang was thoroughly cross-examined regarding the varying versions of the incident he reported to the police, including that he had lied to police up to eleven times. The lead investigating police officer admitted during cross-examination he originally made a recommendation to the District Attorney's office to charge both Appellant and Lang with the murder. Additionally, police officers admitted the case depended heavily on Lang's testimony.

¶9 Police confronted Appellant at his apartment home the following day. After knocking on the door and announcing themselves, a female opened the door. Appellant, standing behind her, appeared startled and began moving rapidly toward the back sliding glass door. Officers stopped him and took him into custody. Appellant was wearing clothing that closely matched the description given by Lang. When told he was under arrest for murder, Appellant's only words were "[f]uck you, mother fucker. Get out of my face."

¶10 An OSBI criminalist tested four samples from Lang's hands taken on the night of the murder and found no gunshot powder residue. An OSBI firearm examiner tested eight items of clothing from Appellant and one from Lang. No gunshot residue particles were found. Another expert testified that the fatal shot was made from a distance of be-

1. One officer testified that, with the exception of Lang, he had no evidence that connects Appellant to Terry's murder. (Tr. IV 815.)

tween one to two feet away from the victim. However, the murder weapon was never located.

¶ 11 Appellant's friend, Justin Ward gave written and oral statements to police as follows: prior to the murder, Appellant told Ward he wanted a nine-millimeter gun for protection;[2] Appellant told him on the day after the murder, while they were at school, that he shot Terry after trying to rob Terry of his Ford Explorer; and Michael Lang (whom Ward knows casually) was there when Appellant attempted to rob Terry.[3] At trial, Ward testified he lied to police. He claimed these statements were false and were given because police were accusing him of being connected to the murder. Ward claimed the police threatened him repeatedly. He admitted to being afraid of Appellant and seemed concerned about Appellant's possible gang affiliations, although he later testified he was not afraid and there were no gang affiliations. (At the preliminary hearing, Ward testified Appellant was a member of the Rolling 60's Crips.) At one point, Ward admitted lying during his direct examination.

¶ 12 Ward testified he was in a Homebound program[4] on the day Appellant supposedly told him about shooting Terry.

¶ 13 Following several interviews with Lang, Lieutenant James Bauman of the Warr Acres Police Department went to Appellant's home, at about 6:00 p.m. on the day after the murder. Bauman asked Appellant's stepmother, Valencia Brown, when Appellant had come home the night before. Mrs. Brown said she did not remember. Mrs. Brown then spoke to her husband on the phone, and Bauman overheard Mrs. Brown tell her husband, "I believe that's what the detective and I are talking about, and I believe he came in at 11 o'clock."

¶ 14 During the trial, however, Mrs. Brown testified Appellant was home on the night in question. She asked him to go get her an Icee at about 9:00 to 9:30 p.m. Appellant left and returned with the Icee ten or fifteen minutes later, before 10 p.m. She saw him playing video games later on. At about 10:45, she asked Appellant's brother Timmy where Appellant was, and Timmy said he had already gone to bed. She saw a telephone cord leading into Appellant's bedroom. Mrs. Brown testified she could hear the door make a bang if someone left the house, and she did not hear a bang that night between 10 and 11 p.m. On cross-examination, however, Mrs. Brown admitted she had told her husband on the phone that Appellant came in at 11 p.m. and that this was still "true today."

¶ 15 Appellant's then girlfriend, Mallory Simms, testified Appellant came over to her apartment at 9:30 p.m. on the night of the murder. They talked for about ten minutes, and he left. Appellant called her later that night, at 10:15 p.m., and they spoke for thirty minutes. When Appellant was arrested, Mallory told her mother that they had been talking on the phone when the crime occurred. This story was somewhat corroborated by Mallory's mother Melanie.

¶ 16 Melanie testified that Mallory received a call from someone at 10:15 p.m. on the night in question. Melanie remembered the call because Mallory was not supposed to receive calls after 10:00 p.m. She yelled at Mallory to get off the phone. Mallory told her the day after Appellant was arrested that she had been talking on the phone to Appellant at the time the murder allegedly occurred. Her mother, however, did not contact the police. When police contacted her, Melanie and Mallory told the police that Appellant was on the phone with Mallory during the relevant time period. Melanie testified the police did not seem to believe the story. Melanie had a caller ID machine, but did not check it to verify the story. At the prelimi-

---

2. Concerning the gun, Ward later testified that "[w]e just talked about it, but (Appellant) wasn't serious about it." He later admitted, however, Appellant did say he wanted the gun.

3. Ward's written statement said, "On 1–7–99 at Putnam City School; around 12:40 PM–1:19 PM while at lunch, Tony Ellis came up to (Justin Ward) in the hall, grabbed Ward & pulled Him aside, and told him, that He Tony shot some-

body. Tony said He shot Him for His car. Ward said What kind of car, Ellis said And (sic) Explorer. And He said He Just took off." Officer Bauman wrote the statement, because Ward had an injured right hand, but Ward signed it.

4. Ward was in the program because he had gotten into trouble. He claimed he could be arrested if he went to school. He did, however, attend a meeting at Putnam City High that day.

nary hearing, she testified she was in the habit of erasing the calls received on at least a daily basis.

¶ 17 Don Lowry testified that he was in his home near the Vend–A–Car–Wash on the night in question at about 10:30 to 10:35 when he heard a gunshot or car backfire. Moments later, he heard tires squealing from a car that was leaving the area pretty fast. Soon afterward, he heard emergency vehicles.

¶ 18 Jason Doty testified he was delivering pizzas in the area that night when he saw a dark colored car pull out of the car wash at about 10:30 p.m. Doty then saw a black male lying on the ground near a truck and another black male standing by a pay phone. Doty went to his apartment and called 911.

¶ 19 Harland Lewis testified that he was driving near the area of the car wash that night at about 10:30 p.m., when he saw a young male run across the street in front of him. He believed the young man had on dark clothing, no hat, and was about six feet tall. Lewis originally reported the man was African American, but he could not really recall his race. Moments later, he saw a young man at the car wash walking around in circles and throwing his hands up in the air, like he was saying, "Oh my God." Lewis also saw a man lying face down beside a Ford Explorer. Lewis then saw approaching police lights.

¶ 20 Appellant's friends, Craig Collins and Chauncy Lewis, testified Appellant owned a car and was not in the habit of walking around the neighborhood; he drove. There was also testimony that Appellant lacked money for gas that day.

¶ 21 Dennis Burgland, a private investigator and former homicide detective, testified the police did not use proper interviewing techniques with Michael Lang. Burgland testified that "the detective was providing (Lang) with the information that the detective needed, necessary to fit the facts of the case as he knew them." Burgland believed this influenced Lang's testimony. He referred to the police investigation in this case as "shoddy."

¶ 22 Burgland interviewed many witnesses and reached the conclusion that Appellant had a solid alibi. He took his information to the police and told them to interview Appellant's girlfriend, but the police did not seem that interested. Burgland could not believe Mallory had not been interviewed before charges were filed against Appellant. He testified that he reviewed a 7–11 store tape from the night in question. Appellant purchased something, then left in a car.

¶ 23 During rebuttal, the State presented evidence, through a third party who entered the 7–11 store that night, indicating the approximate time Appellant entered the 7–11 was 7:33 p.m., not 9–9:30 p.m. as Mrs. Brown testified. He never reentered the store that night before the crime was committed. This differed from a State's witness, who placed the time between 8:30 and 9 p.m.

¶ 24 In proposition one, Appellant claims his right to a speedy trial under the Sixth Amendment to the United States Constitution[5] and Article II, §§ 6 and 20 of Oklahoma's Constitution[6] was violated. He further claims he was denied the statutory expression of that right in 22 O.S.Supp. 1999, § 812.1(A),[7] or in the former expres-

5. The speedy trial provision of the Sixth Amendment provides, "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district where the crime shall have been committed. . . ."

6. Similarly, Section 20 of the Oklahoma Constitution states, in part, "In all criminal prosecutions the accused shall have the right to a speedy and public trial by an impartial jury of the county in which the crime shall have been committed. . . ." Section 6 of the Oklahoma Constitution reinforces the importance of this constitutional right by stating, "The courts of justice of the State shall be open to every person, and speedy

and certain remedy afforded for every wrong and for every wrong and for every injury to person, property, or reputation; and right and justice shall be administered without sale, denial, delay, or prejudice."

7. "If any person charged with a crime and held in jail solely by reason thereof is not brought to trial within one (1) year after arrest, the court shall set the case for immediate review as provided in Section 2 of this act, to determine if the right of the accused to a speedy trial is being protected." This provision was enacted in 1999 and became effective on November 1, 1999. However, it is basically an amendment to sections 811 and 812, which had been around since

sion of that right set forth in 22 O.S.1991, § 812, repealed in 1999.[8] Here, we note Oklahoma does not have a speedy trial act which sets forth a specific period of time for a matter to be brought to trial. *But see* Uniform Criminal Extradition Act, 22 O.S.2001, § 1347.

¶ 25 When reviewing a claim of the denial of the constitutional right to a speedy trial, we apply the four balancing factors established by the United States Supreme Court in *Barker v. Wingo,* 407 U.S. 514, 530, 92 S.Ct. 2182, 2192, 33 L.Ed.2d 101 (1972):(1) length of the delay; (2) reason for the delay; (3) the defendant's assertion of his right, and (4) prejudice to the defendant. These are not absolute factors, but are balanced with other relevant circumstances in making a determination. *Rainey v. State,* 1988 OK CR 65, 755 P.2d 89, 90.

¶ 26 Appellant claims all four factors clearly weigh in his favor and that his speedy trial right has been unquestionably denied.

¶ 27 The State—while conceding the first and third factors weigh in Appellant's favor, i.e., the length of the delay and the defendant's assertion of his rights—claims Appellant's speedy trial rights were not violated, because there were good reasons for the delay and no prejudice suffered by the accused.

¶ 28 The seriousness of this claim cannot be overstated. As the United States Supreme Court has stated,

> The amorphous quality of the (speedy trial) right also leads to the unsatisfactorily severe remedy of dismissal of the indictment where the right has been deprived.

This is indeed a serious consequence because it means that a defendant who may be guilty of a serious crime will go free.... Such a remedy is more serious than an exclusionary rule or a reversal for a new trial, but it is the only possible remedy.

*Barker v. Wingo,* 407 U.S. at 522, 92 S.Ct. at 2188. Thus, regardless of the State's concessions with respect to factors one and three, we must review the facts relating to all four factors in order to apply the necessary balancing, mindful always of the Oklahoma Legislature's statutory expression on this topic.

¶ 29 Regarding the length of delay, Appellant was in jail for nearly two and a half years from the time he was jailed until his trial began.[9] The information was filed on January 15, 1999, just nine days after the crime occurred. However, Appellant had been in custody since January 7, 1999, the day after the crime. (He was arraigned on January 19, 1999, at which time bond was denied.) His trial commenced on May 21, 2001. Thus, the delay was right at two years, four and one half months, or approximately 864 days.

¶ 30 This delay is sufficient, under our case law, to necessitate a review of the other three factors. Indeed, 22 O.S.Supp.1999, § 812.1 indicates our Legislature considers any delay beyond one-year to require special review by the District Court. Even under the former statute, section 812, we have generally regarded the twelve-month interval as a threshold period of time in the speedy trial inquiry. *See, e.g., Snow v. Turner,* 1965 OK CR 115, 406 P.2d 509; *State ex rel. Trusty v.*

1910, but were repealed when the new version was enacted.

**8.** Section 812 provided, "If a defendant prosecuted for a public offense, whose trial has not been postponed upon his application, is not brought to trial at the next term of court in which the indictment or information is triable after it is filed, the court must order the prosecution to be dismissed, unless good cause is shown."

**9.** *See Johnson v. State,* 1988 OK CR 145, 761 P.2d 484, 487 (There is "no doubt" a delay of twenty-two months "is substantial enough to constitute a deprivation of a right to a speedy trial and necessitates an inquiry into the remaining considerations."); *Henderson v. State,* 1987

OK CR 205, 743 P.2d 1092, 1094(sixteen month delay between refilling of information and trial was sufficient to delay to necessitate review of other factors); *Conley v. State,* 1990 OK CR 66, 798 P.2d 1088, 1089 (nearly three year delay was substantial enough to require inquiry into the other factors as set out in Barker); *McDuffie v. State,* 1982 OK CR 150, 651 P.2d 1055, 1056 (264 days not presumptively prejudicial, yet sufficient length to necessitate inquiry into the remaining three factors); *see also Doggett v. U.S.,* 505 U.S. 647, 652, n. 1, 112 S.Ct. 2686, 2691, 120 L.Ed.2d 520 (1992)(noting the "lower courts" have generally found post-accusation delay that approaches one year unreasonable enough to "trigger the *Barker* enquiry").

*Graham,* 1974 OK CR 146, 525 P.2d 1231, 1236 ("Under the 'Snow Rule' one informed against was required to be put to trial within a maximum period of twelve months, considering two terms of court.").

¶ 31 We next consider the second factor, reason for the delay, and the third factor, the defendant's assertion of his right to speedy trial. These factors will be reviewed together, for it is difficult to separate the two under this record.

¶ 32 Following the denial of child and youthful offender status, Appellant was bound over for trial as an adult on October 8, 1999 and bond was denied. His pretrial was set for November 23, 1999. Up to this point, the case was proceeding forward as any other first-degree murder case might. Appellant had been in jail for approximately nine months.

¶ 33 On November 9, 1999, Appellant filed a Motion to Set Bond, asserting he had been in custody since January 7, 1999, and that he was not a flight risk. The motion was to be heard at pretrial, but was continued for ten days because defense counsel had a conflict. When the matter was heard on December 2, 1999, bond was again denied, and the trial was scheduled for March 13, 2000.

¶ 34 On March 6, 2000, Assistant District Attorney Richard Wintory, who had recently been assigned to the case, filed a notice in which he claimed he had trial conflict with two other cases he was handling. Mr. Wintory's notice states, "All three defendants have demanded a speedy trial and have indicated their opposition to any continuances in the above-styled matters." This is the first clear indication of the assertion of the speedy trial right we have found during a painstaking search of the record. A second followed at a motion hearing on March 23, 2000, wherein defense counsel told the trial judge his client would "highly object" to the moving of the trial date, based upon his speedy trial right. Nevertheless, trial was moved to April 24, 2000.

¶ 35 Therefore, the record reveals Appellant asserted his right to a speedy trial. The reason for the delay, however, is more complex.

¶ 36 Two weeks before trial, Mr. Wintory moved for a continuance, claiming the State had interviewed a jailhouse snitch, one Roger Hymes, on November 22, 1999. Hymes had allegedly claimed Appellant told him he killed the victim and threw the murder weapon into a lake near the crime scene. The State, therefore, wanted to drain the lake in order to corroborate the witness and "in order to satisfy the letter and spirit" of this Court's opinion in *Dodd v. State,* 2000 OK CR 2, 993 P.2d 778, which required disclosure of certain matters relating to jailhouse informants prior to trial, on the basis that "Courts should be exceedingly leery of jailhouse informants...." *Dodd,* 993 P.2d at 783. Appellant responded by filing a written objection on April 13, 2000, which again asserted his speedy trial right and accused the State of deliberate delay tactics. Meanwhile, Appellant had been in jail for fifteen months.

¶ 37 The matter was heard before the Honorable Susan P. Caswell, Oklahoma County District Court Judge, the following day. Mr. Wintory argued the prosecution had an obligation to complete the investigation, while defense counsel, Mickey Homsey, argued the case was at the "eleventh hour ... and they want to continue to investigate this case." Mr. Wintory responded by arguing that this Court's opinion in *Dodd* makes it "clear ... the corroboration of jailhouse testimony is at a premium...." The State had searched the lake repeatedly with divers, but had, as yet, been unable to locate a gun. Mr. Wintory estimated it would take three weeks to drain the lake.[10]

¶ 38 Thus, the State had a dilemma. To comply with *Dodd,* the State was required to provide the name of the jailhouse informant, a summary of his testimony, and his criminal background. But unless the State was able to somehow corroborate his story, the State was disinclined to use the informant's testimony at all.

¶ 39 Judge Caswell ruled the State had been diligent in its efforts to search the lake. She also found, "I think it's incumbent on the state to attempt to corroborate Mr. Hymes ... if his testimony is not corroborated, they may not even use him as a witness." Judge

10. The District Court did not find any bad faith on the part of the State and neither do we.

Caswell also recognized that "there comes a point where we have to stop .... there will become a limit to how long we can put this off." Judge Caswell then ruled, "I will rely on the state, they have told me that they will satisfy all the requirements that they are required to of *Dodd*[11] and of the discovery code if Mr. Hymes is going to be a witness." She then granted the State's Motion for continuance, and the trial was delayed two more months, until June 26, 2000.

¶ 40 The trial court's lake ruling thus led to a procedural quagmire, the much-publicized dispute over the lake draining, which essentially resulted in a thirteen month delay of the trial from April 24, 2000 to May 21, 2001. Incidentally, the murder weapon was never located.

¶ 41 The lake draining resulted in numerous hearings upon the various engineering requirements related thereto, the rights of adjoining property owners, the sharing of costs, and ongoing progress.[12] Nevertheless, the State proceeded with the lake's draining, and Court granted continuances due to what it found to be reasonable, diligent efforts by the State. Meanwhile, Appellant continued to assert his speedy trial rights. He also sought to have Judge Caswell disqualified from the case, which was denied at the lower level.

¶ 42 Appellant filed a Writ of Mandamus with this Court on August 3, 2000, seeking an order disqualifying Judge Caswell from the case. This Court stayed all district court proceedings on September 25, 2000, at Appellant's request, as he had yet to receive a ruling on his pending mandamus action. This ultimately led to this Court's Order of October 4, 2000, in which we granted the Writ of Mandamus and ordered Judge Caswell to disqualify herself from the case, based upon "an abuse of discretion as the facts demonstrate an appearance of impropriety."

¶ 43 The parties proceeded back to District Court, and Appellant sought to disqualify the Assistant District Attorneys from the case on October 17, 2000. He also moved for sanctions, a due diligence hearing, and bond to be set. The motions were set before the Honorable Jerry D. Bass, District Judge, on November 15, 2000. The State, through Mr. Wintory, sought to continue the motion because of a conflict. Appellant objected, asserting, again, his right to speedy trial. On November 15, 2000, Judge Bass entered a scheduling order in which Appellant's trial was set for May 21, 2001, six months later.[13] This wound up being the date Appellant's trial actually commenced.[14]

¶ 44 On the first day of trial, March 21, 2001, the State finally responded to Appellant's June 30, 2000 motion to dismiss for want of speedy trial, nearly nine months after it was originally filed. The State's response centered upon a lack of prejudice and *Dodd*, which, according to the State, "require(s) parties to be exceedingly cautious in

---

11. We find no support for the State and Judge Caswell's position that this Court's holding in *Dodd v. State* somehow requires delay of a trial in order to corroborate a jailhouse informant's story. *Dodd* simply sets forth discovery requirements pertaining to a jailhouse informant that the State must disclose within ten days of trial "so that counsel will be prepared to cross-examine an informant-witness." In so doing, a snitch's story will be shown for what it is, suspect. *Dodd* can, in no way, be used as a sword by either side in order to justify a lengthy delay in a trial.

12. On May 18, 2000, the situation became much more complicated. The victim's family began collecting signatures from Oklahoma County residents in support of the lake's drainage. Engineering studies were commissioned. Civil parties were allowed to intervene in the criminal matter. Some of the lake's property owners agreed to contribute $25,000 for the draining.

The mayor of Warr Acres, Mayor Pike, however, refused to sign the contract. Mechanical problems arose. A necessary crane could not move around trees on the property, and Mayor Pike would not order pruning and tree removal. Property owners began complaining of noise. A dam at the lake washed out. Nevertheless, Judge Caswell refused to vacate her order pertaining to the lake draining. We are aware of no authority that would allow a judge in a criminal proceeding to enter an order of a civil nature or allow such intervention by third parties in the criminal proceedings, but we take no position on the matter, as it is not directly raised as an issue in this appeal.

13. It is unclear why Judge Bass scheduled the trial for six months later. A hearing was apparently held but we have no transcript thereof.

14. The case was later transferred to the Honorable Virgil Black, District Judge.

their use of informant testimony and to corroborate the same with additional evidence." Judge Black held a very brief hearing on the motion that day, the first day of trial, and overruled the motion to dismiss, finding no sign of any lack of due diligence.

■ ¶ 45 Accordingly, as the State's brief readily concedes, the third speedy trial factor, the defendant's assertion of his right, weighs in Appellant's favor. "The defendant's assertion of his speedy trial right, then, is entitled to strong evidentiary weight in determining whether the defendant is being deprived of the right." *Barker*, 407 U.S. at 531–32, 92 S.Ct. at 2192–93.

¶ 46 Turning to the second speedy trial factor, reason for the delay, we find the resolution is more complex, resting largely on the prosecution's efforts to locate the murder weapon in an effort to corroborate the statement of a jailhouse informant, a legal interpretation of this Court's holding in *Dodd*, and defense counsel's successful efforts to have Judge Caswell removed from the case for the appearance of impropriety.

■ ¶ 47 *Barker v. Wingo* recognized that the second factor depends on the circumstances of the case. Deliberate delay weighs heavily against the government. Neutral reasons, like negligence or crowded courts, weigh slightly in a defendant's favor, for "ultimate responsibility for such circumstances must rest with the government rather than with the defendant." *Barker v. Wingo*, 407 U.S. at 531, 92 S.Ct. at 2192. And a "valid reason, such as a missing witness, should serve to justify appropriate delay." *Id.*

¶ 48 While *Barker v. Wingo* speaks of a "valid reason," our statute speaks of "appropriateness of the cause of the delay," while the former statute spoke of "good cause."[15] All of these phrases have essentially the same meaning and require the Court to ascertain what is causing the delay and then to ask if the cause is reasonable.

■ ¶ 49 Pursuant to 22 O.S.Supp.1999, § 812.1, Judge Caswell should have scheduled a hearing to determine if Appellant's right to speedy trial was being protected one year after his arrest, or on January 7, 2000. Of course, that statutory provision only became effective two months earlier, and the parties may not have been immediately aware of it.

¶ 50 Under the statute, it is clearly the trial judge's responsibility to manage his or her docket in such a way that ensures the right to speedy trial is being protected. However, the 1999 amendment does not contain a requirement to dismiss the case if the one-year period is exceeded.

¶ 51 Section 812.2(A)(2)(e) requires the Court to look at whether the delay occurred because "there is material evidence or a material witness which is unavailable and that reasonable efforts have been made to procure such evidence or witness, and there are reasonable grounds to believe that such evidence or witness can be obtained and trial commenced within a reasonable time." Thus, the statute acknowledges that the search for material evidence can constitute a reasonable cause for a delay, although this is not necessarily a constitutional protection. In this case, the District Court determined the efforts by the State to corroborate the statement of the jailhouse informant was reasonable under the unusual circumstances. We find nothing in the record to contradict that finding.

¶ 52 While the better procedure might have been for the District Attorney to have dismissed the case under 22 O.S.1991, § 815 and re-filed the case later when the gun was

---

15. We have decided many cases on what does and does not constitute good cause. *See, e.g., Gallimore v. State*, 1997 OK CR 46, 944 P.2d 939, 943 (unavailability of jury docket is not "good cause" under the IADA); *McDuffie*, 651 P.2d at 1056 (appointment of replacement counsel for the defendant, attorney illness, and missing witness constituted "good cause"); *Bauhaus v. State*, 1975 OK CR 34, 532 P.2d 434, 440 (legal proceedings related to another offense constituted good cause); *Vassaur v. State*, 1973 OK CR 400, 514 P.2d 673, 680 (legal reason or delay caused by operation of law constituted "good cause"); *Walters v. Williams*, 1970 OK CR 128, 474 P.2d 661, 664 (procedural delays are not "good cause"); *Walters v. State*, 1969 OK CR 179, 455 P.2d 702, 709 (insanity of defendant is "good cause"); *Pickle v. Bliss*, 1966 OK CR 128, 418 P.2d 69, 74 (unavailability of attorneys and docket are not "good cause"); and *Snow v. Turner*, 406 P.2d at 511 (unavailability of State witnesses is not "good cause").

located, that was not required by the statute. Granted, if the State had followed that procedure, Appellant's liberty interest as a man "innocent until proven guilty" would have been better protected. However, he would have also been subject to a later re-filing, which could have extended the length of the prosecution.

¶ 53 As part of his speedy trial argument dealing with reason for the delay, Appellant claims the "statement" police obtained from jailhouse informant Roger Hymes was inadmissible because the police had "told Hymes to engage in conversation with Mr. Ellis and elicit criminal information." Appellant's Brief at 23. Appellant claims this was a violation of *United States v. Henry*, 447 U.S. 264, 274, 100 S.Ct. 2183, 2189, 65 L.Ed.2d 115 (1980), which held that a defendant's Sixth Amendment right to counsel was violated when the government intentionally created a situation likely to induce the defendant to make incriminating statements without the assistance of counsel. Thus, Appellant claims the State's attempts to corroborate Hymes's story by draining the lake cannot be considered reasonable, as Hymes's statement was inadmissible and should have been suppressed.

¶ 54 We find this case distinguishable from *Henry*. It was Mr. Hymes, not the State, who initiated contact. The record reflects Mr. Hymes contacted his attorney, Roger McCoin, and informed him that Appellant had been bragging about shooting David Terry and throwing the gun in the lake. McCoin then wrote to the Assistant District Attorney and told her these points. A police interview was then set up with Hymes on November 22, 1999 to find out what he knew. During this interview, Hymes reported, among other things, that Appellant had said: the murder weapon would never be found; that the police had "drug a lake for it but they'll never find it"; that the gun "was in the lake"; that Hymes did not know where in the lake the gun was located; and that Appellant had been bragging about the killing. Near the close of the interviews, Hymes mentioned there was something important about "these cigars", but he could not remember what Appellant had said. At this point, one officer suggested Hymes could go

back in and strike up another conversation, saying Hymes was intrigued by all this.

¶ 55 A second interview followed, and we would agree this second statement would have been inadmissible under the teachings of *Henry*. Nevertheless, this would not render the first statement inadmissible, and it was that first interview that alerted officers to Hymes's claim that Appellant had thrown the gun in the lake. Although there were credibility problems, the first statement was still constitutionally admissible. Besides, the State had an interest not only in corroborating Hymes, but also in further investigating an important lead. Thus, we find that most of Hymes's testimony would have been admissible, and corroboration of it was proper to consider as a part of the reason for delay.

¶ 56 One additional point must be considered. The final seven months of the delay was attributable to the stay Appellant sought with this Court while awaiting a ruling on his motion to disqualify Judge Caswell. While this Court did ultimately order Judge Caswell removed for an appearance of impropriety, this seven-month period cannot weigh in Appellant's favor. *See, e.g., United States v. Loud Hawk*, 474 U.S. 302, 316, 106 S.Ct. 648, 656, 88 L.Ed.2d 640 (1986)(finding delay attributable to defendant's interlocutory appeal "ordinarily will not weigh in favor of a defendant's speedy trial claims."). In our view, the mandamus action, which was ultimately successful, should not be fairly weighed in Appellant's favor, for by all appearances Appellant would have gone to trial in October of 2000 had he not sought this relief. By the same token, we recognize a mandamus action is not the same as an interlocutory appeal and the remedy was sought, at least in part, to protect his speedy trial endeavors.

¶ 57 Be that as it may, we find the second speedy trial factor, reason for the delay, weighs in the State's favor.

¶ 58 This brings us to the last factor, prejudice. Both parties correctly note that the United States Supreme Court has held that an affirmative demonstration of prejudice is not a prerequisite to a claim of denial of the right to speedy trial and that prejudice is not limited to detriment to the defense of the

accused. *Moore v. Arizona,* 414 U.S. 25, 94 S.Ct. 188, 38 L.Ed.2d 183 (1973). Nevertheless, prejudice is one of the factors that must be considered, and *Barker v. Wingo* outlined three types: oppressive pretrial incarceration; anxiety and concern of the accused; and impairment of the defense. Of these factors, the Supreme Court considers the third the most serious "because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." *Barker v. Wingo,* 407 U.S. at 532, 92 S.Ct at 2193; *but see Doggett,* 505 U.S. at 661–65, 112 S.Ct. at 2695–97 (Thomas, dissenting) (noting *Barker's* suggestion that preventing prejudice to the defense is a fundamental objective of the speedy trial clause is "plainly dictum" and contradicted by holdings of other cases).

¶ 59 Appellant claims he suffered the following "extraordinary" prejudice: he was denied juvenile certification and thrown into an adult jail; his trial judge had to be removed from the case by this Court based upon an appearance of impropriety; he lost his girlfriend; he missed high school and continuation of his studies; his brother was forced to move to another city; and his father and step-mother divorced. He does not cite any particular impairment to his defense, nor does he support all of these claims with citations to the record.

¶ 60 Appellant's case for prejudice is fairly unsubstantial. No defense witness had an appreciable memory loss. He was afforded a hearing on his motion to certify as a juvenile or youthful offender, which was denied. His defense was in no way impaired. Indeed, the delay attributable to the bizarre lake search inured somewhat to Appellant's benefit, as the gun was not found and, as a result, the State did not present the testimony of the jailhouse informant, whose story could not be substantiated. Regarding the time Appellant sat in jail before trial, seven months was attributable to the stay his counsel sought in order to remove the trial judge. Also, he raised no speedy trial claims during the first nine months or so of the trial, which proceeded forward at a fairly normal rate.

¶ 61 Yes, Appellant suffered some prejudice as a result of the deprivation of his liberty, but up to a year delay could be normally expected in such a case. Between the first year and the last seven months, Appellant's liberty was deprived for approximately nine and a half months, which is not as egregious as many cases. Thus, the fourth factor weighs in the State's favor.

¶ 62 To summarize, we find the first and third speedy trial factors weigh in Appellant's favor, but reasons for the delay and prejudice favor the State.

¶ 63 We consider this case a "close" call. Here, the Court faces the difficult task of weighing an extremely severe remedy in an isolated case with bad facts against the broader protections of an important Constitutional right. We do not take that responsibility lightly, for such decisions have important implications, no matter what we ultimately decide.

¶ 64 After careful consideration, we find Appellant was not deprived of his speedy trial rights under the federal and state constitutions, based upon the finding of reasonable reasons for the delay, the absence of significant prejudice-including some evidentiary benefit Appellant received as a result of the delay—and the less-than egregious deprivation of liberty. Regarding the statutory violation, we find such error was harmless under the facts of this case. *See Simpson v. State,* 1994 OK CR 40, 876 P.2d 690, 701–02.

¶ 65 In proposition two, Appellant claims the State's failure to provide notice of a rebuttal witness deprived Appellant of his rights under the Sixth and Fourteenth Amendments to the Federal Constitution. Appellant, somewhat disingenuously, claims that although he failed to provide the required statutory notice regarding alibi witness Valencia Brown, the State "had an obligation to provide notice of witnesses who would rebut her testimony." (Defense counsel lodged no such objection at trial.) This proposition is wholly without merit, as the defense had full opportunity to view the security tape in question and notice is not required with respect to rebuttal witnesses. *Goforth v. State,* 1996 OK CR 30, 921 P.2d 1291, 1292. Most certainly, there was no plain error.

¶ 66 In proposition three, Appellant claims the evidence was insufficient to sup-

port his guilty verdict. However, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the charged crime beyond a reasonable doubt. *Spuehler v. State*, 1985 OK CR 132, 709 P.2d 202, 203–04.

¶ 67 In proposition four, Appellant claims his counsel rendered ineffective assistance of counsel by: (1) failing to call available witnesses, utilize available evidence, and/or adequately investigate to identify evidence; and (2) failing to properly object to the State's alibi rebuttal witnesses. To support the matters alleged in section one, Appellant has filed, under seal, an Application for Evidentiary Hearing and request to supplement the record.[16] However, we find the application and affidavits do not contain sufficient information to show this Court by clear and convincing evidence there is a strong possibility trial counsel was ineffective for failing to utilize or identify the complained-of evidence. Rule 3.11, *Rules of the Oklahoma Court of Criminal Appeals*, Title 22, Ch. 18, App. (2003). The application for evidentiary hearing is denied. Appellant has failed to show errors by counsel that were so serious as to deprive him of a fair trial, one with a reliable result. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984).

## DECISION

¶ 68 The judgment and sentence are hereby **AFFIRMED.**

JOHNSON, P.J., specially concurs.

LILE, V.P.J., concurs.

CHAPEL and STRUBHAR, JJ., dissent.

JOHNSON, Presiding Judge: specially concurring.

¶ 1 I specially concur in the majority opinion in this case but do so with some reluctance. The United States Supreme Court has three or four balancing factors that enter into an accused's right to a speedy trial. In this case the attorney for the accused, at all stages, asked for a speedy trial.

¶ 2 The United States Supreme Court in *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972) uses the balancing test for the length of the delay, reasons for the delay, continued assertion of Defendant's speedy trial rights and possibly a fourth of prejudice to the Defendant. There was delay in this case, the question is, was it great enough to cause a reversal and to allow what would appear to be a guilty defendant to be set free.

¶ 3 There does not appear to be any prejudice in this case as the jailhouse witness did not testify and such testimony could have been damaging as it was supposedly a confession by Appellant. This case is the well-known comedy of errors and part of the error comes from Appellant's appeal to this court and delaying the trial.

¶ 4 The facts are clear, the guilt appears to be clear, and, as Judge Lumpkin has pointed out, the delay also helped when the gun was not found in the lake. Based upon these factors I would specially concur in affirming the jury's verdict.

CHAPEL, J., dissenting.

¶ 1 Ellis consistently demanded his right to a speedy trial. Despite this he was jailed for nearly two and a half years before his trial began. The case was delayed for changes in prosecution, court docketing convenience, and a lengthy pause for investigation—well after the charges were filed and Ellis bound over—while the prosecution unsuccessfully attempted to recover a weapon which might have been used in the crime. In determining whether this delay so prejudiced Ellis's right to a speedy trial that it requires relief, we consider the four factors set forth in *Barker v. Wingo*:[1] length of the delay, reason for the delay, the defendant's assertion of his right to a speedy trial, and prejudice to the defen-

---

16. The affidavits attached thereto are, for the most part, from Appellant's investigator, who has allegedly talked to several witnesses who made helpful statements concerning Appellant's continuing claim of innocence, but who also refused to sign an affidavit for fear of retaliation. The request for evidentiary hearing, therefore, asks this Court to order those witnesses to appear and testify under oath.

1. 407 U.S. 514, 530, 92 S.Ct. 2182, 2192, 33 L.Ed.2d 101 (1972).

dant. I agree with the majority that two of these factors—length of delay and assertion of his right to speedy trial—weigh in Ellis's favor. I do not agree that the majority of the delay, which was caused by the prosecution, was for good reason. Reviewing the evidence and balancing the factors, I must conclude that the majority of factors weigh in Ellis's favor.

¶ 2 Thirteen months of the delay, from mid-April, 2000, to late May, 2001, occurred while the State attempted to drain a private-property lake in a fruitless search for the murder weapon. A jailhouse informant had told police that Ellis said he threw the gun in that lake, and prosecutors wanted to find the weapon in order to corroborate the informant's story. The majority concludes that this delay was reasonable, since under *Dodd v. State*,[2] the informant's testimony could not be used at trial unless it was corroborated. As the prosecution argued, in order to know whether to call the informant, the State had to corroborate his story by finding the gun. However, this delay would be reasonable only if the informant's testimony were admissible, because *Dodd* applies only to evidence not specifically excluded by the Constitution.[3] A review of the record shows that the informant's testimony would not have been admissible under the Sixth Amendment.

¶ 3 The informant was acting as an agent of the State when he spoke with Ellis. The informant spoke with Ellis after he had been bound over and while he was represented by an attorney. In an interview on November 22, 1999, the informant came to police and told them he had spoken with Ellis about the crime. Police officers asked the informant to go back and continue talking to Ellis, and particularly to find out where the gun was. On December 2, 1999, the informant told police that he had talked to Ellis again and Ellis said he threw the gun in the lake at Willowcliff. This information led to the request to drain that lake.

¶ 4 The use of "incriminating statements made by the accused to an undisclosed and undercover Government informant while in custody and after indictment" violates the Sixth Amendment right to counsel.[4] Ellis vigorously argued this before two trial courts and raises the issue on appeal. As Ellis argued below, and repeats on appeal, if the informant's testimony was inadmissible then it did not need corroboration, and the thirteen-month lake draining delay was unnecessary. Ellis first raised this claim in a motion to suppress filed April 13, 2000, and also argued it in support of his speedy trial claims. Both trial courts appeared to miss the point of Ellis's argument. Focusing on the Fourth and Fifth Amendment questions of search and seizure and self-incrimination, the trial courts failed to consider Ellis's Sixth Amendment claim. Ellis's first trial judge explicitly refused to hear his Sixth Amendment claim, ruling that the issue of admissibility of the informant's testimony was not ripe until the State corroborated his evidence and decided to use him. This is exactly backwards. There was no need to delay the trial, giving the State the chance to decide whether to call the informant, if his testimony was inadmissible to begin with. If the Sixth Amendment right to counsel question had been decided at the time Ellis raised it, there would have been no need for investigation to corroborate the informant's story. At least thirteen months of the subsequent trial delay could have been avoided.

¶ 5 The majority acknowledges *Henry* but attempts to distinguish it by misstating the sequence of events here. Police officers could not speak directly to Ellis, who was represented by counsel. The informant came to officers and told them, unbidden, that Ellis said the gun was in "the lake". The informant did indeed voluntarily approach the police with this story. However, it did not stop there. During that first con-

2. 2000 OK CR 2, 993 P.2d 778.

3. *Dodd*, 993 P.2d at 784.

4. *United States. v. Henry*, 447 U.S. 264, 269, 100 S.Ct. 2183, 2186, 65 L.Ed.2d 115 (1980). While the government agent in *Henry* was paid, the opinion focuses on the man's status officers used him to deliberately elicit information rather than the fact of payment for services rendered. *Henry* relied on *Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), which held that a defendant could not be convicted by statements elicited by a government agent, his co-defendant. This Court recognized this principle in *Dodd v. State*, 2000 OK CR 2, 993 P.2d 778, 783.

versation officers asked which lake, and told the informant they wanted to know specifically what Ellis did with the gun. After this instruction, the informant talked again to Ellis then told officers the name of the lake in which Ellis said he threw the gun. This second statement provided the basis of the State's request to delay Ellis's trial in order to drain a particular lake and search for a particular weapon. The informant's first statement may have been constitutionally admissible, but it was not the statement on which the State relied in conducting its investigation. The informant's voluntary explanation that Ellis threw the gun in "the lake" was enough to make officers ask for the lake's name, in order to investigate the claim. It was the informant's second statement giving the lake's name that the State wanted to corroborate, and that is the information which is inadmissible, because it was discovered at the request of police.

¶ 6 As an agent of the State, the informant's testimony violated Ellis's Sixth Amendment right to counsel, and the delay caused by attempts to corroborate this informant's testimony violated his Sixth Amendment right to a speedy trial. As *Henry* says, the initial constitutional violation here is the government's intentional creation of "a situation likely to induce Henry to make incriminating statements without the assistance of counsel".[5] Subsequently, Ellis's demands for a speedy trial were disregarded while the State attempted to corroborate information which was illegally obtained. Therefore, I cannot join the majority's conclusion that this reason for delay favors the State.[6] I add it to the balance of factors already weighing in Ellis's favor.

¶ 7 I also disagree with the majority's conclusion that the prejudice Ellis suffered from this lengthy delay was fairly unsubstantial, and with the apparent weight the majority opinion places on this factor. I am particularly concerned about the effect of the delay in prosecution given his youth. Ellis was seventeen at the time of the crime. His application for certification as a juvenile or, in the alternative, as a youthful offender, was denied despite a recommendation from the Office of Juvenile Affairs that he retain Youthful Offender status, and he was certified as an adult. The Youthful Offender Study, and the accompanying psychological evaluation, both noted that Ellis appeared to be a normal teenager of average intelligence, and found no explanation for the crime in Ellis's history, character or circumstances.

¶ 8 In this context, and given his clean criminal record and negligible school discipline record, Ellis's claims of prejudice are particularly poignant. Ellis was in jail for the entire pre-trial period. He could not complete high school or begin college, lost his girlfriend, and his immediate family was damaged. The guarantee of a speedy trial is designed to protect an accused from lengthy pretrial incarceration and impaired liberty, and to shorten the disruptions of life which occur with an arrest and pending criminal charges.[7] The right to speedy trial covers the period of time in which Ellis was presumed to be innocent and enjoyed the same rights to life, liberty, and the pursuit of happiness as any other citizen.[8]

¶ 9 While Ellis, who claimed he was innocent, does not allege any specific harm done to his defense case, he suffered exactly the type of prejudice the Speedy Trial Clause is designed to prevent. Absent a particular

---

**5.** *Henry*, 447 U.S. at 275, 100 S.Ct. at 2189.

**6.** I agree with the majority that we should hold the last seven months of trial delay neutral, benefiting neither side. I disagree with the majority's implication that Ellis might have avoided this delay had he not moved to disqualify the original trial judge.

**7.** *Bowie v. State*, 1995 OK CR 4, 906 P.2d 759, 761; *United States v. MacDonald*, 456 U.S. 1, 7, 102 S.Ct. 1497, 1501, 71 L.Ed.2d 696 (1982).

**8.** The majority suggests that some of the delay worked in Ellis's favor. I disagree with the majority's comment that this delay actually

helped Ellis since no gun was found; as the informant's testimony about the gun was inadmissible under the Constitution, the State could not have used the evidence. I find repugnant the implication that, rather than delay the trial while his motion for disqualification was heard, Ellis could have agreed to be tried by a trial judge this Court ultimately removed from the case. Ellis had no need to raise a speedy trial claim in the first months of trial. It was only when the trial became, in the majority's phrase, a procedural quagmire, that Ellis was forced to unsuccessfully attempt to assert his Sixth Amendment rights.

claim of egregious harm, this factor does not weigh heavily in Ellis's favor. However, as the majority opinion notes, prejudice is not the foremost Sixth Amendment consideration, and it is not limited to prejudice which damages a defense.[9] Even were Ellis to claim less specific prejudice than he has, the presumptive prejudice arising from a lengthy delay is always a factor to be considered in applying the *Barker v. Wingo* analysis.[10] We are required to weigh all four factors equally in determining whether Ellis's right to speedy trial was violated.[11] I find that the first three factors—length of delay, the reason for the delay, and Ellis's assertion of his right—all weigh in Ellis's favor. Were I to completely disregard the prejudice Ellis suffered to his rights as a citizen, I cannot conclude that the lack of serious prejudice outweighs the three remaining factors. This Court is directed to weigh the factors equally. Doing so, I must conclude that Ellis's right to a speedy trial was violated. I would reverse.

STRUBHAR, J., dissenting.

¶1 I find merit in Appellant's claim presented in proposition one. When one considers the four factors set forth in *Barker v. Wingo*, 407 U.S. 514, 530, 92 S.Ct. 2182, 2192, 33 L.Ed.2d 101 (1972), I find a substantial violation of the constitutional right to a speedy trial. The only remedy is that this case be reversed with instructions to dismiss.

**9.** *Moore v. Arizona,* 414 U.S. 25, 26–27, 94 S.Ct. 188, 189, 38 L.Ed.2d 183 (1973).

**10.** *Doggett v. United States,* 505 U.S. 647, 655–56, 112 S.Ct. 2686, 2692–93, 120 L.Ed.2d 520 (1992).

**11.** *Barker,* 407 U.S. at 533, 92 S.Ct. at 2193.